**Opinion issued October 18, 2012**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-10-00740-CV**

**NO. 01-10-01150-CV**

———————————

**JAVIER ALVARADO, Appellant**

**V.**

**LEXINGTON INSURANCE COMPANY, Appellee**

———————————

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-36711A**

———————————

## OPINION ON REHEARING

Appellee, Lexington Insurance Company ("Lexington"), moved for rehearing of our April 19, 2012 opinion. We grant the motion for rehearing,

withdraw our April 19, 2012 opinion and judgment, and issue this opinion and judgment in their stead. Our disposition remains the same. We dismiss Lexington's May 21, 2012 motion for en banc reconsideration as moot.[1]

Appellant, Javier Alvarado, sued Lexington for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code and the Deceptive Trade Practices Act ("DTPA") after Lexington rejected Alvarado's claim for property damage following Hurricane Ike. The trial court rendered summary judgment in favor of Lexington. In one issue, Alvarado contends that the trial court erred in rendering summary judgment because Lexington did not conclusively negate Alvarado's status as a third-party beneficiary under the "force-placed" insurance policy issued by Lexington to Alvarado's mortgage lender.

We reverse and remand for further proceedings consistent with this opinion.

### Background

Before May 2008, Alvarado maintained homeowner's insurance on his property with Columbia Lloyds. Alvarado testified by affidavit that when he refinanced his mortgage in May 2008 with Flagstar Bank ("Flagstar"), a Flagstar representative informed him that he had to cancel his policy with Columbia Lloyds and that Flagstar would obtain homeowner's insurance on his behalf. Flagstar

---

[1] *See Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 40 & n.2 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

2

obtained a "force-placed" insurance policy on Alvarado's property with Lexington ("the Policy").[2]  Alvarado's monthly payments to Flagstar included the principal and interest on his mortgage, as well as taxes and the premiums on the Policy.

In September 2008, Alvarado's property sustained damage as a result of Hurricane Ike.  Flagstar made a claim on the Policy, and Lexington paid Flagstar $4,410.49 in damages.  According to Alvarado's affidavit, Flagstar did not provide any of these funds to Alvarado for the purpose of repairs, and it did not apply these funds to the balance of his mortgage.  The application of these funds is not part of the record.

After Lexington denied his claim for damages, Alvarado sued Lexington for breach of contract, breach of the duty of good faith and fair dealing, and various violations of the Texas Insurance Code and the DTPA.[3]  Alvarado alleged that he was the owner of the Policy and that Lexington had "sold the policy, insuring the property to [Alvarado] or [Alvarado's] predecessors in interest."  Among other allegations, Alvarado argued that Lexington "failed to perform [its] contractual

---

[2]     A "force-placed," or "lender-placed," mortgage protection insurance policy "insures the lender's collateral when the borrower fails to maintain a specific type of insurance" and "allows the lender to protect its exposure on a property up to the amount of the mortgage on the date of issuance." *Williams v. Certain Underwriters at Lloyd's of London*, 398 Fed. App'x 44, 45 (5th Cir. 2010) (not designated for publication).

[3]     Alvarado also sued Michael Bower, the insurance adjuster who handled Alvarado's claim.  Bower is not a party to this appeal.

3

duty to adequately compensate [Alvarado] under the terms of the policy" and that Lexington "misrepresented to [Alvarado] that the damage to the property was not covered under the policy, even though the damage was caused by a covered occurrence."

Lexington moved for traditional summary judgment. It argued that Alvarado could not recover on any of his claims because Lexington never entered into a contract with Alvarado; Alvarado was neither a named insured nor an additional insured on the Policy; Flagstar obtained the Policy "to protect its interest in the residence for which Flagstar was the mortgagee"; the Policy provided that all payments for damages were to be made solely to Flagstar; and the Policy "expressed no intent to benefit [Alvarado] in any way." Lexington contended that Alvarado did not qualify as a third-party beneficiary of the Policy and that, as a result, no legal relationship existed between it and Alvarado and Alvarado lacked standing to bring his claims.[4]

As summary judgment evidence, Lexington attached a copy of the Policy as Exhibit A. Lexington pointed out that the "Common Policy Declarations" in the Policy provide that "Flagstar Bank, FSB" is the "named insured" and that the

---

[4] After Lexington moved for summary judgment, Alvarado amended his petition to add claims against Flagstar and Proctor Financial, Inc., the insurance agent responsible for procuring the Policy. Alvarado subsequently non-suited his claims against Flagstar with prejudice. Neither Flagstar nor Proctor Financial is a party to this appeal.

4

"Mortgage Guard Property Policy" section further defines "named insured" as "the Lending Institution named on the Declaration Page" and "you" as "the Named Insured shown in the Declarations." It further pointed out that the Policy states, "In consideration of the premium to be charged we will (as shown on the Declaration Page) insure . . . the Lending Institution (you, as shown on the Declaration Page) against direct physical loss resulting from destruction of or damage to your property . . . ." It also pointed to language in the Policy stating that the Policy provides coverage for the dwelling, other structures on the property, personal property, and loss of use "in which the insured has a mortgage and/or owner interest." Lexington argued that, although the Policy covers personal property, that coverage is limited to the extent to which Flagstar, as the named insured, has a mortgage or ownership interest in the property.

> The Policy also includes the following "Mortgage Clause":
>
> Loss, if any, under this policy will be payable to the mortgagee (or trustee) as its interests may appear under all present or future mortgages upon the Covered Property described on the reporting forms in which mortgagee may have an interest as mortgagee (or trustee) in order of precedence of said mortgages.

Lexington pointed out that the "Loss Payable" clause provides, "Loss will be adjusted with and made payable to you unless another payee is specifically named." It observed that this clause does not provide that Alvarado, the borrower, is entitled to proceeds in excess of Flagstar's insurable interest in the property, nor

5

does it allow Alvarado to participate in the claim adjustment process. It emphasized that neither Alvarado nor his property is specifically mentioned in the Policy.

In response to Lexington's summary judgment motion, Alvarado argued that Endorsement #12 to the Policy, entitled "Special Broad Form Homeowners Coverage," expressly provides homeowners' coverage for homeowners of properties specified on reporting forms referenced by the Policy. He argued that this endorsement directly benefits him and supports his third-party beneficiary status. Alvarado pointed to language in Endorsement #12 defining "insured" as "[y]ou and residents of your household" and defining "insured location" as the "residence premises," which is further defined as "[t]he one family dwelling where you reside." He contended that this language refers to him and not to Flagstar, the mortgage company. Alvarado also pointed out that Endorsement #12 provides coverage for direct physical loss to property, additional living expenses, personal property damage, personal liability for suits brought against the insured for bodily injury or property damage, and medical payments to others. He contended that this coverage could only apply to him and not to Flagstar. He also argued that Endorsement #12 confers a benefit upon him because the endorsement's "Mortgage Clause" provides, "If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests

6

appear." According to Alvarado, "This clearly shows that the word 'you' in the Endorsement refers to [Alvarado] . . . but it does not necessarily refer to the mortgagee which would be Flagstar Bank." Therefore, Alvarado contended, because Endorsement #12 "was intended to confer a direct benefit" on him, he qualifies as a third-party beneficiary of the Policy.

Lexington replied and argued that Endorsement #12 "only provides homeowners coverage for property and damages in which *Flagstar* has a mortgage and/or an ownership interest." (Emphasis in original.) Lexington contended that the

> Supplemental Declaration Page [to the Policy] qualifies *every statement* made about homeowner's insurance in the Policy, leaving no doubt that all homeowner's coverage statements and inclusions are meant *solely and exclusively* to pertain to the insured, Flagstar Bank's, interest. Any references [Alvarado] makes to the Homeowners Coverage Form are limited by the Supplemental Declaration Page.

(Emphasis in original.) Lexington argued that, under the supplemental declarations, any coverage provided pursuant to the Policy is limited to property or damages in which the named insured, which is defined in the Common Policy Declarations solely as Flagstar, has a mortgage or ownership interest. Lexington also argued that the Policy language clearly defines "you" as the "Named Insured shown in the Declarations" and that Alvarado is not named as an insured, additional insured, or third-party beneficiary in any part of the Policy, including Endorsement #12.

Neither Lexington nor Alvarado submitted any summary judgment evidence demonstrating whether or not Alvarado's property is specified on the reporting forms submitted by Flagstar to Lexington showing properties covered by Endorsement #12. Nor is there any evidence as to what Flagstar's and Alvarado's interests in the property are. However, there is some evidence, in the form of Alvarado's affidavit, that Flagstar submitted a claim under the Policy to Lexington for damage to Alvarado's property and that Flagstar did not repair the damage, did not distribute the funds to Alvarado to repair the damage, and did not apply the funds to the balance of Alvarado's mortgage.

On August 19, 2010, the trial court granted Lexington's motion for summary judgment. Because Alvarado's claims against Bower, Flagstar, and Proctor Financial remained pending, this was an interlocutory order that was not yet final and appealable. Alvarado, however, prematurely filed a notice of appeal, and the appeal was assigned to this Court and given appellate cause number 01-10-00740-CV. Alvarado filed a motion to sever his claims against Lexington, which the trial court granted, and the trial court then rendered judgment in favor of Lexington on November 19, 2010. After the trial court rendered this final judgment, Alvarado filed a second notice of appeal, which resulted in appellate cause number 01-10-

01150-CV. We decide the first-filed appeal, appellate cause number 01-10-00740-CV, and dismiss appellate cause number 01-10-01150-CV.[5]

## Standard of Review

We review de novo the trial court's ruling on a summary judgment motion. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). To prevail on a traditional summary judgment motion, the movant must establish that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 381 (Tex. 2004). When a defendant moves for summary judgment, it must either: (1) disprove at least one essential element of

---

[5] Pursuant to Texas Rule of Appellate Procedure 27.1, Alvarado's first prematurely filed notice of appeal was effective and was deemed filed on the day of, but after, the event that began the period for perfecting the appeal: November 19, 2010, the day the trial court granted Alvarado's motion to sever and rendered a final judgment in favor of Lexington. *See* TEX. R. APP. P. 27.1(a); *Ganesan v. Reeves*, 236 S.W.3d 816, 817 (Tex. App.—Waco 2007, pet. denied) ("[Rule 27.1] is designed to make it clear that a notice of appeal filed before the final appealable judgment is rendered is nevertheless effective to invoke our appellate jurisdiction of such a judgment."); *Espalin v. Children's Med. Ctr. of Dallas*, 27 S.W.3d 675, 681 (Tex. App.—Dallas 2000, no pet.) ("[A] document filed in an attempt to appeal an interlocutory order that later becomes final serves to appeal the final judgment."). In a factually similar scenario, the El Paso Court of Appeals noted that the second notice of appeal, filed after the trial court rendered a final judgment, "was unnecessary to perfect appeal." *Lerma v. Forbes*, 144 S.W.3d 18, 20 (Tex. App.—El Paso 2004, no pet.). The El Paso court dismissed the later cause number on its own motion and consolidated the record with the first cause number. *Id.* We follow the El Paso Court of Appeals' decision in *Lerma* and hold that Alvarado's first notice of appeal invoked our appellate jurisdiction, and, thus, the second notice of appeal was unnecessary to perfect his appeal and is now moot. We therefore dismiss appellate cause number 01-10-01150-CV, which resulted from his second notice of appeal.

9

the plaintiff's cause of action, or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995).

If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The evidence raises a fact issue if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam). To determine if the nonmovant has raised a fact issue, we view the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding*, 289 S.W.3d at 848 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *See Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997)).

**Third-Party Beneficiary Status**

In his sole issue, Alvarado contends that the trial court erred in rendering summary judgment in favor of Lexington because Lexington failed to conclusively negate his status as a third-party beneficiary of the Policy. Lexington responds that

10

this Court should overrule Alvarado's sole issue and affirm the summary judgment because Alvarado failed to plead his third-party-beneficiary status. It further argues that we should affirm the summary judgment because Alvarado failed to raise a genuine issue of material fact with respect to his third-party-beneficiary status.

### 1. *Alvarado's Right to Argue His Third-Party-Beneficiary Status*

Before we address the merits of Alvarado's sole issue, we address Lexington's contention that Alvarado was required to plead third-party beneficiary status, and that, because he did not, we should affirm the trial court's summary judgment on that basis alone.

Lexington's contention is without merit. Lexington itself raised the issue of Alvarado's third-party-beneficiary status by arguing in its summary judgment motion that Alvarado did not qualify as a third-party beneficiary to the Policy and therefore lacked standing. Standing is a jurisdictional issue that cannot be waived and may be raised at any time. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). Here, it was raised by Lexington as grounds for granting it summary judgment against Alvarado.

Rule 166a provides that a defendant against whom a claim is asserted "may, at any time, move with or without supporting affidavits for summary judgment in his favor as to all or any part thereof." TEX. R. CIV. P. 166a(b). The Rule further

11

provides that summary judgment shall be granted if the motion and the summary judgment evidence "show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or other response." *Id.* 166a(c). Lexington moved for summary judgment on all of Alvarado's claims on the ground that he lacked standing to pursue them because he was neither a party to the insurance contract between Lexington and Flagstar nor a third-party beneficiary of the contract. Alvarado responded to this issue in his summary judgment response. The issue of Alvarado's third-party-beneficiary status was thus squarely before the trial court in Lexington's motion and Alvarado's response. Lexington's contention that Alvarado may not seek to overturn a summary judgment on the very issue it presented to the trial court in its own motion as the basis for granting summary judgment is directly contrary to the express language of Rule 166a and is without merit.

We now turn to the merits of Alvarado's sole issue.

### 2. Third-Party-Beneficiary Status Under Force-Placed Insurance Policies

Insurance contracts are subject to the same rules of construction as ordinary contracts. *Archon Invs., Inc. v. Great Am. Lloyds Ins. Co.*, 174 S.W.3d 334, 338 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (citing *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex. 1997)). When a policy permits only one

reasonable interpretation, we construe it as a matter of law and enforce it as written. *Id.* (citing *Upshaw v. Trinity Cos.*, 842 S.W.2d 631, 633 (Tex. 1992)). When construing an insurance policy, "[w]e must strive to effectuate the policy as the written expression of the parties' intent." *Id.* (citing *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995)). To discern the intent of the parties to a contract, the court examines and considers the entire writing to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless, no single provision taken alone will be given controlling effect, and all the provisions will be considered with reference to the whole instrument. *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011). If the term to be construed is unambiguous and susceptible of only one construction, we "give the words in the policy their plain meaning." *Archon*, 174 S.W.3d at 338 (citing *Devoe v. Great Am. Ins.*, 50 S.W.3d 567, 571 (Tex. App.—Austin 2001, no pet.)).

In determining whether a third party can enforce a contract, we look only to the intention of the contracting parties. *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 900 (Tex. 2011); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999); *Union Pac. R.R. Co. v. Novus Int'l, Inc.*, 113 S.W.3d 418, 421 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right to enforce the contract.

*Basic Capital Mgmt.*, 348 S.W.3d at 899–900; *MCI Telecomms.*, 995 S.W.2d at 651; *Union Pac.*, 113 S.W.3d at 421.

A third party may recover on a contract made between other parties only if the contracting parties intended to secure a benefit to the third party and only if the contracting parties entered into the contract directly for the third party's benefit. *Basic Capital Mgmt.*, 348 S.W.3d at 900; *MCI Telecomms.*, 995 S.W.2d at 651; *Union Pac.*, 113 S.W.3d at 421. The third party must show that he is either a donee or a creditor beneficiary of the contract, and not one who is only incidentally benefitted by its performance. *MCI Telecomms.*, 995 S.W.2d at 651; *Union Pac.*, 113 S.W.3d at 421. A party is a donee beneficiary if the promised performance will, when rendered, come to him as pure donation. *MCI Telecomms.*, 995 S.W.2d at 651; *Union Pac.*, 113 S.W.3d at 421. If that performance will come to him in satisfaction of a legal duty owed to him by the promisee, such as an "indebtedness, contractual obligation or other legally enforceable commitment," he is a creditor beneficiary. *MCI Telecomms.*, 995 S.W.2d at 651; *Union Pac.*, 113 S.W.3d at 421.

"We glean intent from what the parties said in their contract, not what they allegedly meant." *Union Pac.*, 113 S.W.3d at 421. We will not create a third-party beneficiary contract by implication. *Basic Capital Mgmt.*, 348 S.W.2d at 900; *MCI Telecomms.*, 995 S.W.2d at 651; *Union Pac.*, 113 S.W.3d at 422; *see also Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) ("[I]n the absence of a clear and

14

unequivocal expression of the contracting parties' intent to directly benefit a third party, courts will not confer third-party beneficiary status by implication."). As the Texas Supreme Court held in *MCI Telcommunications*,

> The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied. Consequently, a presumption exists that parties contracted for themselves unless it "clearly appears" that they intended a third party to benefit from the contract.

995 S.W.2d at 651; *see also Basic Capital Mgmt.*, 348 S.W.3d at 900 (quoting same).

Due to the presumption against finding third-party beneficiaries to contracts, courts will generally deny third-party-beneficiary claims unless: (1) the obligation of the bargain-giver is fully spelled out, (2) it is unmistakable that a benefit to the third party was within the contemplation of the contracting parties, and (3) the contracting parties contemplated that the third party would be vested with the right to sue for enforcement of the contract. *Union Pac.*, 113 S.W.3d at 422. We resolve all doubts against conferring third-party-beneficiary status. *Tawes*, 340 S.W.3d at 425; *see also First Union Nat'l Bank v. Richmont Capital Partners I, L.P.*, 168 S.W.3d 917, 929 (Tex. App.—Dallas 2005, no pet.) ("If there is any reasonable doubt as to the intent of the contracting parties to confer a direct benefit on the third party, then the third-party beneficiary claim must fail.").

Texas's third-party beneficiary policy was recently examined and explained by the Texas Supreme Court in *Basic Capital Management*. 348 S.W.3d 894. In that case, Basic managed real estate investment trusts, including American Realty Trust, Inc. ("ART") and Transcontinental Realty Investors, Inc. ("TCI"). *Id.* at 896. Basic and Dynex signed a Commitment, in which Dynex agreed to loan funds to "single-asset, bankruptcy-remote entities" ("SABREs") owned by ART and TCI if Basic would "propose other acceptable SABREs to borrow $160 million over a two-year period." *Id.* at 896–97. The issue on appeal was whether ART and TCI could recover damages from Dynex for its alleged breach of the Commitment as third-party beneficiaries to the Commitment. *Id.* at 898.

The supreme court reasoned that, because the intention to confer a direct benefit to a third party must be clearly and fully spelled out in the contract for that party to have standing as a third-party beneficiary, "a presumption exists that parties contracted for themselves unless it clearly appears that they intended a third party to benefit from the contract." *Id.* at 900. Although only Dynex and Basic had signed the Commitment, "Dynex knew that the purpose of the Commitment was to secure future financing for ART and TCI, real estate investment trusts that Basic managed and in which it held an ownership interest." *Id.* Not only was Basic not intended to be the borrower, but the Commitment expressly required that

16

the borrowers be SABREs acceptable to Dynex, and Dynex knew that Basic would not own the SABREs. *Id.*

The court concluded that this requirement was for Dynex's benefit, since SABREs are designed to provide more certain recourse to collateral in the event of default. *Id.* The court pointed out that "SABRE-borrowers provided a mechanism for ART and TCI to hold investment property directly but in a way that would provide Dynex greater security." *Id.* Thus, "if Dynex and Basic did not intend the Commitment to benefit ART and TCI directly, then the Commitment had no purpose whatsoever." *Id.* Moreover, the Commitment "clearly and fully spelled out the benefit to ART and TCI because their role was basic to Dynex's and Basic's agreement." *Id.* at 901. The court concluded, "The Commitment itself, and the undisputed evidence regarding its negotiation and purpose, establish that ART and TCI were third-party beneficiaries." *Id.*

Although Texas state courts have addressed whether a party may be a third-party beneficiary in the general insurance policy context, they have not addressed the specific issue of whether a homeowner-borrower qualifies as a third-party beneficiary under a force-placed insurance policy entered into between the insurance company and the mortgage company. *See, e.g.*, *Paragon Sales Co. v. N.H. Ins. Co.*, 774 S.W.2d 659, 660–61 (Tex. 1989) (holding distributor presented some evidence that it was third-party beneficiary of indemnity contract between

17

insurance company and public motor carrier). As a result of Hurricanes Dolly, Katrina, and Rita, however, some federal courts within the Fifth Circuit Court of Appeals' jurisdiction, primarily in Louisiana, have addressed this issue and have reached differing conclusions as to the homeowner's third-party-beneficiary status according to the specific terms of the policy and the facts of the case.

When deciding whether a homeowner-borrower is a third-party beneficiary under a force-placed insurance policy, the federal courts applying state law, like the Texas courts, have looked to the language of the policy to determine whether any of the provisions clearly confer a direct benefit upon the borrower. Thus, for example, the Fifth Circuit has found third-party beneficiary status to exist (1) when the policy, although only listing the mortgage company as a named insured, contains a subrogation clause providing that the homeowner-borrower will not be liable to the insurance company for any loss paid to the named insured and (2) when the policy contains a provision allowing for temporary housing expenses to be paid to the homeowner-borrower. *See Palma v. Verex Assurance, Inc.*, 79 F.3d 1453, 1457–58 (5th Cir. 1996) (subrogation clause case decided under Texas law).

In *Palma*, the Fifth Circuit held that the inclusion of the subrogation clause within the insurance policy demonstrated a clear intention on the part of the contracting parties to benefit the homeowner-borrower. *See id.* at 1458 ("[The

subrogation clause] is written for the sole benefit of the borrower. . . .  We also find that the insurance contract was actually made, in part, for the benefit of Palma [the borrower].”); *see also Henderson v. Certain Underwriters at Lloyds, London*, Civil Action No. 09-1320, 2009 WL 3190710, at *3 (E.D. La. Sept. 30, 2009) (slip op.) (noting that plaintiff’s standing was limited solely to seeking temporary housing expenses because this was only clause in policy providing direct benefit to borrower).

Primarily, the federal district courts have focused on whether the policy contains one of two specific clauses that may benefit the borrower:  (1) an “excess loss” or “residual payment” clause or (2) a clause providing that the insurer will adjust all personal property losses with, and pay any such proceeds to, the homeowner-borrower.  A common excess loss clause provides as follows:

> We will adjust all losses with you [the mortgagee and named insured].
> We will pay you but in no event more than the amount of your interest
> in the “insured location.”  Amounts payable in excess of your interest
> will be paid to the “borrower” unless some other person is named by
> the “borrower” to receive payment . . . .

*See, e.g.*, *Turner v. Gen. Ins. Co. of Am.*, Civil Action No. 5:09cv00057-DCB-JMR, 2009 WL 3247302, at *3 (S.D. Miss. Oct. 7, 2009) (slip op.).  If the policy provides coverage for personal property, the insurance policy may include a clause providing that the insurer will adjust all losses to personal property with the

homeowner-borrower and will pay the borrower any proceeds for such loss, unless the borrower has named another person to receive payment. *Id.*

A number of courts in the cases in which there were force-placed policies with such clauses have found third-party-beneficiary status for homeowners under the terms of the particular policy. For example, in *Lee v. Safeco Insurance Co. of America*, the United States District Court for the Eastern District of Louisiana held that the excess loss clause, which "clearly stipulate[d] that the portion of any loss payment exceeding the value of [the mortgagee's] interest in the property will be paid directly to [the homeowner-borrower]," manifested a "clear intent to benefit the borrower." Civil Action No. 08-1100, 2008 WL 2622997, at *4 (E.D. La. July 2, 2008) (not designated for publication); *see Turner*, 2009 WL 3247302, at *4; *Beck v. State Farm Fire & Cas. Co.*, No. 2:07 CV 1998, 2008 WL 4155301, at *2 (W.D. La. Sept. 5, 2008) (not designated for publication) (finding third-party-beneficiary status when policy contained excess loss clause and provision allowing for adjustment of personal property losses with and payment of such losses to borrower); *Navarrete v. Gen. Ins. Co. of Am.*, Civil Action No. 07-4865, 2008 WL 659477, at *2 (E.D. La. Mar. 7, 2008) (not designated for publication) (same); *Peters v. Safeco Gen. Ins. of Am.*, Civil Action No. 07-5612, 2008 WL 544226, at *1 (E.D. La. Feb. 25, 2008) (not designated for publication) (same); *Martin v. Safeco Ins. Co.*, Civil Action No. 06-6889, 2007 WL 2071662, at *3 (E.D. La. July

20

13, 2007) (not designated for publication) (same); *see also Hickman v. Safeco Ins. Co. of Am.*, 695 N.W.2d 365, 370–71 (Minn. 2005) (holding same when policy contained excess loss clause, coverage for personal property, provision that insurer would adjust personal property losses with borrower and would pay borrower, and provision allowing borrower to seek arbitration of appraisal of covered loss).

The Eastern District of Louisiana has also held, however, that a homeowner-borrower was *not* a third-party beneficiary to an insurance policy containing an excess loss clause when the claimed damages did not exceed the mortgagee's interest in the property, as required by the terms of the policy for her to be considered an additional insured. *Graphia v. Balboa Ins. Co.*, 517 F. Supp. 2d 854 (E.D. La. 2007). In *Graphia*, the policy provided that the borrower "shall be considered an additional insured with respect to any residual amounts of insurance over and above [the mortgagee's] insurable interest." *Id.* at 857. The borrower claimed damages of $56,542.91, and she presented evidence that the balance remaining on her loan was $110,000. *Id.* The court noted that there was "no amount 'due for the loss' that exceeds [the mortgagee's] insurable interest." *Id.* The court concluded, "The contract does manifest a clear intention to benefit Graphia, but only to the extent that she has an insurable interest in the property. The contract evidences no intent to give plaintiff personal rights in the insurance coverage for losses that do [not] exceed the mortgagee's insurable interest." *Id.* at

21

858. Because her losses did not exceed the mortgagee's interest in the property, Graphia received only an incidental benefit from this policy and, therefore, could not enforce the contract. *Id.*; *cf. Mingo v. Meritplan Ins. Co.*, No. 2:06 CV 1914, 2007 WL 4292026, at *3 (W.D. La. Dec. 4, 2007) (not designated for publication) (denying insurer's motion to dismiss for lack of standing because parties disputed amount of loss and record did not reflect either amount of mortgage or mortgagee's interest in property).

The federal courts have also found the force-placed homeowner not to be a third-party beneficiary when the homeowner did not receive a direct benefit from the policy under the policy's own terms. Specifically, the federal courts have denied third-party beneficiary status when the insurance policy states (1) that it does not provide coverage for loss of use, personal liability, or personal property, (2) that the mortgagee is the sole insured, (3) that the policy is intended to protect the mortgagee's interest only and not the borrower's, or (4) that all losses will be adjusted with and made payable to the named insured, the mortgage company. *See Williams v. Certain Underwriters at Lloyd's of London*, 398 Fed. App'x 44, 48–49 (5th Cir. 2010) (not designated for publication) (policy specified that mortgagee was sole insured and all benefits were payable directly to mortgagee); *Lumpkins v. Balboa Ins. Co.*, 812 F. Supp. 2d 1280, 1283–84 (N.D. Okla. 2011) (policy provided no coverage for contents, personal effects, personal living expenses, fair

22

rental value or liability and stated that contract was only with named insured and only intended to protect named insured's interest); *Barrios v. Great Am. Assurance Co.*, Civil Action No. H-10-3511, 2011 WL 3608510, at *4 (S.D. Tex. Aug. 16, 2011) (slip op.) (policy specified that, unless homeowners coverage was specifically added by endorsement, homeowner-mortgagor was not insured under policy); *Williams v. Fid. Nat'l Ins. Co.*, Civil Action No. 07-4428, 2009 WL 2922310, at *3 (E.D. La. Sept. 8, 2009) (not designated for publication) (policy specified that, despite insurable interests of homeowner, only mortgagee was insured under policy); *Simpson v. Balboa Ins. Co.*, Civil Action No. 2:08cv281KS-MTP, 2009 WL 1291275, at *3–4 (S.D. Miss. May 7, 2009) (policy provided no coverage for loss of use, personal liability, or personal property and no right of borrower to participate in claim adjustment); *Jones v. Proctor Fin. Ins. Corp.*, Civil Action No. 06-9503, 2007 WL 4206863, at *3 (E.D. La. Nov. 21, 2007) (not designated for publication) (policy provided no coverage for personal property, and adjustment of and payment for loss would be made solely to mortgagee); *Paulk v. Balboa Ins. Co.*, No. 1:04CV97, 2006 WL 1994864, at *3 (S.D. Miss. July 14, 2006) (not designated for publication) (same); *see also Scheaffer v. Balboa Ins. Co.*, 1 So. 3d 756, 759 (La. Ct. App. 2008) (notice of premium informed borrower that he was not insured under policy, that he was not entitled to receive proceeds, and that policy protected only mortgagee's interest).

Mere payment of the force-placed-policy premiums by the homeowner-borrower, without more, does not necessarily confer third-party-beneficiary status on the borrower. *See Scheaffer*, 1 So. 3d at 760; *Lee*, 2008 WL 2622997, at \*3 ("Mere payment or reimbursement of insurance premiums by a plaintiff to an insurance provider does not create a right to recovery under an insurance policy when the plaintiff is not the named insured and is nowhere named in the policy.").

### 3. *Alvarado's Status Under Flagstar's Force-Placed Policy*

On appeal, Alvarado argues that he has third-party-beneficiary status under the Policy. He contends that Endorsement #12 to the Policy, which provides "Special Broad Form Homeowners Coverage," is analogous to an excess loss clause or a clause allowing for adjustment and payment of losses to the borrower. He argues that it demonstrates that Lexington and Flagstar clearly intended to benefit him because the terms of this endorsement provide the type of coverage that he, as the homeowner, would seek to obtain if he contracted directly with Lexington to procure homeowner's insurance and that these provisions are irrelevant to Flagstar as the mortgagee of the property. He points out that Flagstar required the Policy when it loaned him the money to purchase his house and took a mortgage on it. Alvarado paid the premiums on this force-placed Policy as a separate part of his monthly mortgage payments, and Endorsement #3 to the Policy required a higher premium for the Special Broad Form Homeowners Coverage.

24

Lexington responds that Flagstar is the sole named insured in the Policy, that Alvarado is not mentioned in the Policy, and that the plain language of the Policy can reasonably be construed only as protecting Flagstar's mortgage interest in the property up to the extent of that interest, not as protecting Alvarado's interest. It argues, therefore, that the Policy cannot be construed as intended to benefit Alvarado, as a matter of law; that Alvarado is not a third-party beneficiary to the Policy under prevailing law construing force-placed insurance policies; and that Alvarado has failed to raise a material fact issue as to his third-party-beneficiary status.

We conclude that Lexington has failed to prove that Alvarado lacks third-party-beneficiary status as a matter of law.

### a. The "Common Policy Declarations" and the "Supplemental Declaration Page" of the Policy

As Lexington states, the "Common Policy Declarations" in the "Commercial Lines Policy" at issue list "Flagstar Bank, FSB" as the sole "Named Insured." These Declarations state that the Policy "consists of the following coverage parts for which a premium is indicated," namely, a "Mortgage Guard Property Coverage Part." The Common Policy Declarations then state:

> THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

25

For the "Form(s) and Endorsements(s) made part of this policy at time of issue," the Common Policy Declarations page states, "See attached Table of Contents." The Table of Contents lists as "[c]overage forms and endorsements forming a part of this policy" the "Mortgage Guard Property Policy" and a number of additional endorsements, including Endorsement #12, a "Homeowners 3 Special Form" providing "Special Broad Form Homeowner's Coverage." The Common Policy Declarations state that the complete Policy consists not only of the common declarations and policy conditions, but also of the coverage part declarations, coverage part forms, and "the forms and endorsements, if any, issued to form a part" of the Policy. In this case, therefore, the Policy at issue includes not only the Common Policy Declarations and the Mortgage Guard Property Policy with its declarations, but also Endorsement #12, the Special Broad Form Homeowner's Coverage form, with its declarations.

In addition to the Common Policy Declarations, the Policy includes a "Supplemental Declaration Page" that sets out Lexington's "Limits of Liability" under the Common Policy:

$1,000,000. Per property        On Commercial or Residential Properties*

$500,000. Per location        Mobile Home Properties*

$1,000,000. Per property        Windstorm and Hail only*

Homeowners Coverage as reported as HO on the reporting form

26

A. Dwelling-$500,000. Any one loss*

B. Other Structures-$50,000. Or 10% of the insured value, whichever is the lesser*

C. Personal Property-$250,000. Or 50% of the insured value, whichever is the lesser*

D. Loss of Use-$100,000. Or 20% of the insured value, whichever is the lesser*

*in which the Insured has a mortgage and/or owner interest and which is specifically described in the Reporting Mechanism agreed upon by the Company.

Thus, the Policy provides that Lexington's liability is limited to $1,000,000 "per property." Additionally, coverage for properties with "Homeowners Coverage as reported as HO on the reporting form" is limited to $500,000 for "any one loss," plus the lesser of $50,000 or 10% of the insured value for any other structure on the property, plus the lesser of $250,000 or 50% of the insured value of any personal property, plus the lesser of $100,000 or 20% of the insured value for loss of use. An asterisk by each of these categories of covered loss limits Lexington's liability to properties "in which the Insured has a mortgage and/or owner interest and which is specifically described in the Reporting Mechanism agreed upon by the Company." Lexington has produced no summary judgment evidence that Alvarado's property was not among the properties with "Homeowners Coverage" reported by Flagstar on Lexington's reporting form and specifically described by Flagstar in Lexington's Reporting Mechanism at the time of the occurrence made

27

the basis of his claim. However, it did produce the "Homeowners Coverage" part of the Policy, Endorsement #12, as part of the Policy applicable to Alvarado, and Alvarado has averred that he paid premiums for this coverage. Therefore, we assume, for purposes of the summary judgment motion, that Alvarado did have Homeowners Coverage and therefore was included on Lexington's reporting forms. *See Sw. Elec. Power Co.*, 73 S.W.3d at 215.

### b. The "Mortgage Guard Property Policy"

The "Mortgage Guard Property Policy" provides that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations," namely Flagstar, and that "[t]he words 'we', 'us' and 'our' refer to the Company providing this insurance," i.e., Lexington. The Mortgage Guard Property Policy sets out the agreement of Lexington and Flagstar with respect to this part of the Policy:

> In consideration of the premium to be charged we will (as shown on the Declaration Page) insure (but only in the event there is no other insurance applicable) the Lending Institution (you, as shown on the Declaration Page [here, Flagstar]) against direct physical loss resulting from destruction of or damage to your property, reported by you on the reporting forms furnished by us, for the Covered Causes of Loss described in this policy.

The Mortgage Guard Property Policy thus protects Flagstar against physical loss to its property reported on Lexington's reporting forms, but "only in the event there is no other insurance applicable."

28

The Mortgage Guard Property Policy identifies several types of interest the "Named Insured" lending institution, Flagstar, may have in a property and may report on Lexington's reporting forms. These include a "Loan" consisting of "an advance of funds or a loan secured by a note and first or second 'mortgage interest/loan balance' evidenced by a contract of sale for real property." Correspondingly, the Policy defines a "Borrower" as an individual "obligated on a 'loan' . . . and [who] has . . . an interest in the property securing such 'loan.'" The Mortgage Guard Property Policy states, "Loss will be adjusted with and made payable to you unless another payee is specifically named." The "Mortgage Clause" states, "Loss, if any, under this policy will be payable to the mortgagee [Flagstar] (or trustee) as its interests may appear under all present or future mortgages upon the Covered Property described on the reporting forms in which mortgagee may have an interest as mortgagee (or trustee) in order of precedence of said mortgages." Thus, the Mortgage Guard Property Policy, by its own terms, insures Flagstar against direct physical loss resulting from the destruction of or damage to "your property," i.e., property in which it has a mortgage or ownership interest and that is reported by Flagstar on Lexington's reporting forms, in the event there is no other insurance applicable.

The "Policy Conditions" for the Mortgage Guard Property Policy confirm the intent of the contracting parties to cover physical loss to covered property at

29

described locations, stating, "Our liability for loss with respect to any property covered will not exceed the Limit of Liability stated in the Declarations as applicable, nor exceed, in any event, the lesser of the amount it would cost to repair or replace with material of like kind and quality, or the amount of insurance specified on each Covered Property at the Described Location on the reporting forms completed by you and furnished to us."

Provisions in the Mortgage Guard Property Policy specify the means by which Flagstar must report damage for property; they grant it permission, "[i]n the event of loss . . . to make reasonable repairs . . . provided the repairs are confined solely to the protection of the Covered Property from further damage and provided you keep an accurate record of the repair expenditures," to "be included in determining the amount of loss"; they impose duties of notice, reporting of damage, and protection of the covered property in the event of loss; they provide for the examination of Flagstar or its representative "about any matter relating to this insurance or a claim"; and, "*[i]n the event of a dual interest*," they allow Lexington to require the agreement of "*any mortgagor claiming coverage or monetary benefit under this insurance*" to "submit to an examination under oath . . . about any matter relating to this insurance or a claim." (Emphasis added.) These provisions thus recognize that the Mortgage Guard Property Policy covers payment for repairs to damaged property within the scope of the Policy, and they

30

also recognize that a mortgagor, as well as Flagstar, may claim "coverage or monetary benefit under this insurance."

There is no way to determine from the summary judgment evidence whether Alvarado is the owner of residential property described by Flagstar on Lexington's reporting forms, because those forms are not in the record. However, there is summary judgment evidence, in the form of Alvarado's affidavit, that Flagstar reported damage to Alvarado's property to Lexington. It is also not possible to determine from the summary judgment record precisely what claims either Flagstar or Alvarado submitted to Lexington with respect to damage to the property or what amount of money for what losses was paid by Lexington to Flagstar. Nor is it possible to ascertain the extent of Flagstar's mortgage interest in Alvarado's property and the extent of Alvarado's interest. However, Alvarado avers that his property sustained damage as a result of Hurricane Ike in 2008, that Flagstar made a claim on the Policy, and that Lexington paid Flagstar $4,410.49 in damages. He further avers that Flagstar did not provide any of these funds to him for the purpose of repairs and that it did not apply these funds to the balance of his mortgage. We consider each of these uncontested facts as stated by Alvarado, the nonmovant, to be true, as we must under summary judgment law. *See Fielding*, 289 S.W.3d at 848; *City of Keller*, 168 S.W.3d at 827.

We conclude that the Policy manifests a clear intent to directly benefit both Flagstar and "any mortgagor claiming coverage or monetary benefit" for damage to property under the Policy, as their interests may appear as mortgagee or mortgagor of a covered property at the described locations listed by Flagstar on Lexington's reporting forms. We further conclude that Flagstar is the mortgagee of Alvarado's property and that Alvarado is a mortgagor with an ownership interest in a property described on Lexington's forms whose property was damaged and for which Flagstar submitted a claim and was paid. However, it is not possible to determine from the Mortgage Guard Property Policy whether Alvarado was a mortgagor who had a right to claim coverage under the Policy for damage to his property. Therefore, we turn to Endorsement #12 of the Policy.

### c. *Endorsement #12: Special Broad Form Homeowners Coverage*

Endorsement #12, titled "Special Broad Form Homeowners Coverage," is relied upon by Alvarado to show his third-party-beneficiary status under the Policy. It provides the type of coverage that an individual homeowner would generally seek from an insurance company, instead of the coverage that a mortgagee seeking solely to protect its monetary interest in the property would typically seek. Endorsement #12 states, "It is understood and agreed [by Flagstar and Lexington] that the following coverages are added to this policy and that these coverages apply only to owner occupied properties reported as 'HO' property type

32

by the Insured [Flagstar]: Special Broad Form Homeowners Coverage, Homeowners 3, Special Form, ED. 10-00 (HO-3, Ed. 10-00)." This statement is immediately followed by declarations specific to Endorsement #12 that incorporate the property coverage limits from the Common Policy Declarations and Supplemental Declaration Page and add additional "Property Coverage," "Liability Coverages," and "Exclusions." The endorsement states, "All other terms and conditions remain unchanged." It is unclear, however, whether Endorsement #12 formed a part of the Policy insuring Alvarado's property. Alvarado claims that it did, and Lexington included Endorsement #12 as part of the Policy on Alvarado's property. Therefore, we take it as true for purposes of this summary judgment motion that Alvarado's property was listed by Lexington as a property carrying Homeowner's Insurance.[6] *See Sw. Elec. Power Co.*, 73 S.W.3d at 215.

The Homeowners Coverage provided by Endorsement #12 is spelled out on the Special Form. Section I, "Property Coverage," provides coverage up to the

---

[6] Lexington attached to its motion for rehearing a document purporting to show that Alvarado's property was listed as a "Residential Owner" or "RO" on its reporting forms and claimed that this is a different type of coverage that does not extend the protections of "HO" coverage to Alvarado. This improper attempt to supplement the summary judgment record to change the facts of Alvarado's status on appeal is sufficient by itself to show that summary judgment was improperly granted. *See* TEX. R. CIV. P. 166a(c) ("The judgment sought shall be rendered forthwith if . . . the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response.").

"[l]imit stated on the Declaration Page." This part of the Homeowners Coverage clearly references the limits for property damage for residences referred to on the Supplemental Declaration Page of the Policy. In addition, Section II, "Liability Coverages," provides coverage to the owners of the specified properties for "Personal Liability" of "$100,000 per person/$300,000 per occurrence" and coverage for "Medical Pay to others" of "$1,000 per person/$25,000 per accident." This Homeowners Coverage part of the Policy further provides that "[t]he combined limit of liability under the policy for Special Broad Form Homeowners Coverage shall not exceed $1,000,000 for the policy period."

Endorsement #12 also states that "[t]he earned premium for each daily period shall be calculated by multiplying the total amount of insurance specified on the reporting form furnished by the Company by the rate stated on the Rates and Deductibles Page." The Rates and Deductibles page—Endorsement #3 to the Policy—specifies that, for "Special Broad Form Homeowners Coverage," "each claim for loss or damage (separately occurring) shall be adjusted separately," and it defines the deductible for different types of covered properties, including Occupied Residences. Endorsement #3 charges a higher premium for Special Broad Form Homeowners Coverage. Finally, Endorsement #12 specifies that the homeowner's coverage ceases to apply when a property becomes vacant or goes into foreclosure, and it further specifies that "[o]n the date the property status changes the regular

34

residential coverage as indicated in the Residential Property Coverages policy section will apply to that property," i.e., the coverage indicated on the Supplemental Declaration Page of the Common Policy applies, and not the coverage indicated in Endorsement #12.

The "Definitions" part of Endorsement #12 defines the term "Insured" for the purpose of properties covered under the "Homeowners Coverage" addition to the Policy in terms that can reasonably refer only to the homeowner, not to Flagstar. Section A of the "Definitions" states, "In this policy, 'you' and 'your' refer to the 'named insured' shown in the Declarations and the spouse if a resident of the same household. 'We', 'us' and 'our' refer to the Company providing this insurance." Section B of the "Definitions" states, "In addition, certain words and phrases are defined as follows." Definition 5 defines "Insured" to mean, in pertinent part, "[y]ou and residents of your household who are . . . [y]our relatives; or . . . [o]ther persons under the age of 21 and in the care of any person named above." Thus, the "insured" for purposes of Endorsement #12 can reasonably be interpreted only as the homeowner of a covered property, and not as the "Named Insured" under the Common Policy, Flagstar, or as the "insured" Lending Institution under the Mortgage Guard Property Policy, also Flagstar.

"Insured location" is defined to mean, in pertinent part, "the 'residence premises.'" "Residence premises" is further defined as "[t]he one family dwelling

35

where you reside . . . and which is shown as the 'residence premises' in the Declarations" and "other structures and grounds at that location."

"Occurrence" is defined to mean, in pertinent part, "an accident, including continuous or repeated exposure to substantially the same general harmful condition, which results, during the policy period, in . . . [p]roperty damage," i.e., "physical injury to, destruction of, or loss of use of tangible property." The "Deductible" part of the endorsement states, "Unless otherwise noted in this policy, the following deductible provision applies: Subject to the policy limits that apply, we will pay only that part of the total of all loss payable under Section 1 ["Property Coverages"] that exceeds the deductible amount shown in the Declarations."

Subsection A of "Section 1—Property Coverages" of Endorsement #12 expressly states, "We cover . . . [t]he dwelling on the 'residence premises' shown in the Declarations, including structures attached to the dwelling; and . . . [m]aterials and supplies located on or next to the 'residence premises' used to construct, alter or repair the dwelling or other structures on the 'residence premises.'" Subsections B, C, and D of Section 1 provide insurance coverage for, among other things, personal property, loss of use, which includes additional living expenses and fair rental value, debris removal, reasonable repairs, and credit card fraud.

Finally, "Section 1—Conditions" of Endorsement #12 provides that, "[e]ven if more than one person has an insurable interest in the property covered, [Lexington] will not be liable in any one loss [t]o an 'insured' for more than the amount of such 'insured's' interest at the time of loss." The "Loss Payment" provision states: "We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment." Endorsement #12 also includes a "Mortgage Clause" that provides, "If a mortgagee is named in this policy, any loss payable . . . will be paid to the mortgagee *and you*, as interests appear." (Emphasis added.) "Section II—Liability Coverages" provides personal liability coverage for bodily injury or property damage, as well as coverage for medical payments to others.

All of these provisions of this endorsement are meaningful only if the "Insured" and "you" referenced in the Definitions and Property Coverages of Endorsement #12 mean the homeowner of an owner-occupied property reported by Flagstar to Lexington on Lexington's reporting forms as having force-placed Homeowners Coverage and if the Homeowners Coverage part of the Policy is interpreted as directly insuring the homeowner against loss to property, both real and personal, as well as insuring him against personal liability and certain other personal losses, such as loss of use of the property and additional living expenses.

37

We conclude that the language in Endorsement #12 makes apparent the contracting parties' intent to confer a direct benefit on the homeowner of "owner occupied properties reported as 'HO' property type by the Insured" under the conditions specified in the Policy and that that benefit is made applicable to property owners when their property is "added to this policy" by Flagstar on Lexington's reporting forms. *See Basic Capital Mgmt.*, 348 S.W.3d at 900; *MCI Telecomms.*, 995 S.W.2d at 651; *see also Palma*, 79 F.3d at 1457–58 (holding that homeowner-borrower was third-party beneficiary of force-placed insurance policy when policy contained provision that was for "sole benefit" of borrower); *Henderson*, 2009 WL 3190710, at *3 (limiting standing to seeking temporary housing benefits because this was only clause in policy providing benefit to homeowner); *Beck*, 2008 WL 4155301, at *2 (finding third-party-beneficiary status when policy contained excess loss clause and allowed adjustment of personal property damages with borrower); *Navarrete*, 2008 WL 659477, at *2 (same); *Hickman*, 695 N.W.2d at 370–71 (same).

We further conclude that, because Alvarado pays the premiums on his policy directly to Flagstar, which forwards them to Lexington, and, in return, Alvarado receives the property and liability coverage provided by the Policy under the "Special Broad Form Homeowners Coverage" added by Endorsement #12, Alvarado is a creditor beneficiary of the contract between Flagstar and Lexington.

38

*See MCI Telecomms.*, 995 S.W.2d at 651 (stating that if performance will come to third party in satisfaction of legal duty owed to him by promisee, including "contractual obligation or other legally enforceable commitment," he is creditor beneficiary of contract).

Lexington argues, however, that the type of policy at issue in this case does not confer third-party-beneficiary status on homeowners. It refers us to a recent opinion from the United States District Court for the Southern District of Texas in a diversity case brought under Texas law, which addressed the effect of a "Special Broad Form Homeowners Coverage" endorsement on the homeowner-borrower's status as a third-party beneficiary in a case similar to the present one. *See Trevino v. Evanston Ins. Co.*, Civil Action No. M-11-18, 2011 WL 2709063, at *3 (S.D. Tex. July 12, 2011). In that case, the homeowner made the same argument Alvarado makes here: because the endorsement provides coverage that is irrelevant to the mortgagee and that "could only inure to the benefit of [the homeowner]," the endorsement demonstrates the contracting parties' intent to confer a direct benefit on the homeowner. *Id.*

The federal district court noted that the insurance company, Evanston, "counters that these coverages [for personal liability, medical pay to others, personal property loss, and loss of use coverage] only become available when a mortgagee complies with the reporting provisions of the Mortgage Guard Policy,

which require the mortgagee to notify Evanston of 'any change of ownership or occupancy or increase of hazard,' *i.e.*, foreclosure, and to pay additional risk premiums." *Id.* The court concluded, without analysis of the language in the endorsement or the factual circumstances of the case, other than the plaintiff had "made a claim under the policy seeking coverage for roof and water damage sustained by the property as a result of Hurricane Dolly on July 23, 2008," that "the Policy language unambiguously manifests the intent to provide hazard coverage to [the mortgagee] to the extent of its interest in the property, and any benefit conferred to [the homeowner] as a result is incidental," and that the homeowner "has pointed to no provision that makes clearly apparent the contracting parties' intent to confer a direct benefit on Plaintiff." *Id.* The court ultimately held that the homeowner-borrower was not a third-party beneficiary under the insurance policy at issue and had no standing to pursue his claims. *Id.* at *1, *3.

In the instant case, by contrast, the Policy language does unambiguously manifest the contracting parties' intent to provide coverage directly to the owners of the properties described by Flagstar on Lexington's reporting forms for property damage, including coverage for personal property damage and personal liability, when Special Broad Form Homeowners Coverage is added to the Policy by an endorsement, as spelled out in the Policy. *See Basic Capital Mgmt.*, 348 S.W.3d at

40

900; *MCI Telecomms.*, 995 S.W.2d at 651. Alvarado, unlike Trevino, did point to a provision in the Policy, Endorsement #12, that makes apparent the contracting parties' intent to confer a direct benefit on owners of property reported by Flagstar on Lexington's reporting forms that meet certain conditions specified in the Policy, including owning a Homeowner's Policy. Thus, we find *Trevino* to be distinguishable and its legal conclusions to be inapplicable to this case.

The dissent, however, finds *Trevino* persuasive. It reasons that this case is more closely analogous to the Texas Supreme Court's decision in *MCI Telecommunications*, in which the court found no third-party-beneficiary status, than to its decision in *Basic Capital Management*. We disagree. In *MCI Telecommunications*, Texas Utilities contracted with the Missouri Pacific Railroad ("MoPac") to obtain a license to install an electric transmission line on MoPac's right-of-way. 995 S.W.2d at 648–49. Twelve years later, MCI contracted with MoPac to use the right-of-way to install a fiber optic cable. *Id.* at 649. MCI's contract with MoPac contained a provision requiring MCI to exercise its contract rights "in such a manner as not to interfere in any way with any existing prior rights," such as the rights of existing licensees. *Id.* The contract also included a provision explicitly stating that no provision of the contract "shall be construed as being for the benefit of any party not in signatory hereto." *Id.* at 649–50. The Texas Supreme Court reversed both the trial court and the Fort Worth Court of

41

Appeals and held that Texas Utilities was not a third-party beneficiary of MCI's contract with MoPac. *Id.* at 651. The court reasoned that, although the contract included a provision protecting Texas Utilities' rights as an earlier licensee, the contract did not provide a direct benefit to Texas Utilities and no contractual language indicated that MCI and MoPac contracted for Texas Utilities' benefit. *Id.* at 651–52. At best, Texas Utilities was an "incidental beneficiary" of the contract. *Id.* at 652. The court also noted that the contract explicitly stated that it "is not to be interpreted as conferring any benefits on nonsignatory parties" and that it "reflects the intention of the parties that there be no third-party beneficiary to the contract." *Id.*

Unlike the contract at issue in *MCI Telecommunications*, the Policy at issue in this case includes provisions directly benefitting the owners of properties reported on Lexington's forms—specifically including those set out in Endorsement #12—and it does not include a comparable explicit provision restricting construction of the Policy to benefit only the signatories to the Policy. In fact, the Mortgage Guard Property Policy contains language contemplating that the homeowner-mortgagor may have a dual interest and may potentially claim coverage or a monetary benefit under the Policy. And Endorsement #12 expressly states that it provides additional coverage to that provided by the rest of the Policy, spells out the protections that the additional coverage provides, and states where

42

this coverage differs from the coverage in the Common Policy in terms that can apply only to the homeowner of a residential property, here Alvarado, reported to Lexington by a mortagee, here Flagstar, as having Special Broad Form Homeowners Coverage. It also defines such a residential homeowner as the "insured" for purposes of homeowners' coverage. Finally, Endorsement #12 expressly distinguishes the insured residential mortgagor from the mortgagee as a person having covered interests under the Policy and recognizes that they may have dual interests.

As the Texas Supreme Court noted in *MCI Telecommunications*, when interpreting a contract, "we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless." *Id.* at 652. We conclude, as in *Basic Capital Management*, that the additional coverage in Endorsement #12 for which the homeowner is forced to pay additional premiums "ha[s] no purpose whatever" and is meaningless unless the "Special Broad Form Homeowners Coverage" was intended by Lexington, the insurer of the property, and Flagstar, the mortgagee, to directly benefit the mortgagors and homeowners of the properties specifically described by Flagstar on Lexington's reporting forms. *See Basic Capital Mgmt.*, 348 S.W.3d at 900.

It was Lexington's burden, as movant for summary judgment, to prove its entitlement to summary judgment against Alvarado as a matter of law. We hold

that Lexington failed to carry its burden of conclusively negating Alvarado's status as a third-party beneficiary to the Policy. Thus, we hold that the trial court erred in rendering summary judgment in favor of Lexington.

We sustain Alvarado's sole issue.

## Conclusion

We reverse the judgment of the trial court in appellate cause number 01-10-00740-CV and remand that case for further proceedings consistent with this opinion. We dismiss appellate cause number 01-10-01150-CV.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Sharp.

Justice Bland, dissenting.