**DROPLETS, INC., Plaintiff,**

v.

**E\*TRADE FINANCIAL CORPORATION, et al., Defendants.**

**No. 12 Civ. 2326(CM).**

United States District Court, S.D. New York.

April 4, 2013.

---

**14.** The reader should note that this Amended Opinion is the product of that redaction process.

338

Brandon M. Jordan, McKool Smith PC, Washington, DC, James Andrew Holmes, The Law Office of James Holmes, PC, Henderson, TX, James E. Quigley, Joshua Wright Budwin, McKool Smith, PC, Austin, TX, Brett E. Cooper, Lauren Lee Fornarotto, McKool Smith, New York, NY, Samuel Franklin Baxter, Theodore Stevenson, III, McKool Smith, Dallas, TX, for Plaintiff.

Abraham Delao, Brian David Range, Wilson Sonsini Goodrich & Rosati, Austin,

TX, Lucy Yen, Jessica Leigh Margolis, Wilson Sonsini Goodrich & Rosati, New York, NY, Larry L. Shatzer, Wilson Sonsini Goodrich & Rosati, P.C., Washington, DC, Michael Brett Levin, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Defendants.

## DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM

McMAHON, District Judge.

Before the Court in this patent infringement case are cross motions: Plaintiff's motion to dismiss Defendants' counterclaim for breach of contract on the ground that Defendants lack standing to pursue it; and Defendants' motion for summary judgment, on the ground that they are third party beneficiaries of a settlement agreement that bars Plaintiff from suing them for patent infringement.

The parties present the issues as straightforward issues of contract construction involving an unambiguous contract. I agree that some clauses in the contract on which the parties focus are unambiguous and can be construed by the Court; I also agree that Defendants are third-party beneficiaries of a covenant not to sue that is explicitly contained in the contract.

However, I cannot yet conclude whether Defendants are immune from suit. That question depends on whether Defendants' web sites are appropriately considered "software" or "applications" so as to qualify for "Licensed Product" protection under one section of the Agreement; or alternatively, whether they are appropriately considered "Adobe Products," as that term is defined in the Agreement, in order to fall under another definition of "Licensed Products." The parties' briefs fail to clash on these issues, and the parties have not submitted evidence from which I could determine the matter—or, to the extent they have, the evidence raises a genuine issue of material fact.

Both motions are, therefore, denied—both Plaintiff's motion to dismiss the counterclaim for lack of standing and Defendants' motion for summary judgment, which invokes the covenant not to sue.

## BACKGROUND

### I. Statement of Facts

Virtually all the facts are undisputed.

### A. The Droplets/Adobe Litigation

Droplets holds U.S. Patent 6,687,745 (the "'745 Patent"), covering a "System or method for delivering a graphical user interface of remote applications over a thin bandwidth connection." It has also obtained U.S. Patent 7,502,838 (the "'838 Patent"), which is a daughter patent covering related technology. These are referred to as the "Licensed Patents."

On July 31, 2006, Droplets filed suit against, *inter alia*, Adobe Systems Incorporated (Adobe), alleging infringement of the '745 Patent.

The lawsuit was settled as of October 7, 2008, when the parties thereto executed a Settlement and License Agreement (the Agreement). The Agreement is to be construed under the law of the State of Texas.

### B. The Settlement and License Agreement

The Agreement contains the following relevant definitions:

*"Adobe Customer/User"* means any licensed customer, licensed user, developer, distributor, reseller, original equipment manufacturer, or retailer of any Licensed Product. (Sec. 1.2)

*"Licensed Product(s)"* shall mean

(i) Any and all past, present and future Adobe products, processes, components, software, hardware, technology, data, methods, services, or activities or instructions of any kind singly or in combination with any other products, processes, components, software, hardware, technology, data, methods, services, or activities or instructions (collectively, "Adobe Products") and

(ii) Any and all past, present and future third party software or applications either

(a) that are developed or written using any Adobe Products or

(b) not in limitation of the foregoing, to the extent such software or applications use any Adobe Product to practice any invention claimed in the Licensed Patents. (Sec. 1.3)

The Agreement contains the following Releases:

Subject to full payment as contemplated herein ... Droplets and its officers, directors, and employees hereby voluntarily, fully and forever, irrevocably and unconditionally, release, acquit, and discharge:

(a) all Claims brought or that could have been brought in the Lawsuit against the

(i) Adobe Customers/Users with respect to any and all Licensed Products and

(ii) Adobe Parties, and

(b) all other past, present or future Claims arising in whole or in part as of or prior to the Effective Date against the

(i) Adobe Customers/Users with respect to any and all Licensed Products and

(ii) Adobe Parties, including Claims relating to the Licensed Patent(s), other intellectual property, trade secrets or breach of contract ... (Sec. 2.1)

The Agreement contains the following Licenses:

Subject to full payment as contemplated herein ... Droplets hereby voluntarily, fully and forever, and unconditionally, grants to Adobe a worldwide, irrevocable, unrestricted, nonexclusive, fully paid-up, royalty-free, perpetual license under the Licensed Patent(s) to make, have made, use, sell, offer for sale, import or otherwise exploit the Licensed Products. Droplets hereby grants to Adobe Customers a worldwide, irrevocable, fully paid-up, royalty-free, perpetual, limited to the Licensed Products, nonexclusive, nontransferable license under the Licensed Patents to make, have made, use, sell, offer for sale, import or otherwise exploit the Licensed Products. No Claim of direct or indirect infringement or misappropriation of any patent or other intellectual property right may be based in whole or in part on any evidence of the existence, operation, or effect of a Licensed Product. (Sec. 3.3)

The Agreement contains the following Covenant Not to Sue:

Subject to full payment as contemplated herein. . . . Droplets hereby voluntarily, fully and forever, and unconditionally, grants to Adobe an irrevocable, unrestricted, fully paid-up, perpetual covenant not to sue (i) Adobe Customers/Users with respect to any and all Licensed Products and (ii) Adobe with respect to any and all Claims against Adobe, including Claims relating to the Licensed Products or based on the Licensed Patent(s) and any other intellectual property of Droplets, breach of contract claims, tort claims and trade secret misappropriation claims. (Sec. 3.1)

The Agreement contains the following additional sections of potential relevance:

No claim of direct or indirect infringement or misappropriation of any patent

or other intellectual property right may be based in whole or in part on any evidence of the existence, operation, or effect of a Licensed Product. (Secs. 2.1(b) and 3.3)

The covenants and licenses in this Section 3 shall fully exhaust all Claims covered by this Section 3 as to each Licensed Product, regardless of whether it has any reasonable or intended use other than the practice of the Licensed Patent(s) or embodiment of essential features. (Sec. 3.4)

No license is granted by Droplets either directly or by implication, estoppel, or otherwise other than under the Licensed Patent(s) nor with respect to anything other than the Licensed Product. No right to sublicense (other than as provided by Section 3.3) is granted hereunder except as may occur by operation of law as a result of the express grants set forth herein. (Sec 3.5)

## C. The Settlement Negotiations

Certain aspects of the settlement negotiations that led to the terms of the Agreement are important to understand the arguments made by the parties about what the Agreement means.

The Agreement went through a number of drafts. The Court has been provided with five drafts and one mark-up of a draft that preceded the final executed Agreement. These drafts show how the provisions quoted evolved from the form in which they were initially proposed into their final form.[1]

In particular:

The earliest draft (Ex. 15) was circulated by Adobe.[2] The term "Adobe Products" is defined using exactly the language that appears in the final Agreement, which is to say, the language of Sec. 1.3(i). (Ex. 15, Sec. 1.3) The term "Licensed Products" does not appear in the draft. Neither is there any language granting any sort of License to customers of Adobe, or agreeing not to sue them. In fact, the phrase "Adobe Customers" or "Adobe Customers/Users" does not appear in this draft.

Droplets redlined Ex. 15. (Exs. 16/17[3]) Plaintiff included a number of new provisions that were designed to limit the scope of "Adobe Products" to products that were made or sold by Adobe, and not third party products that incorporated Adobe technology. So, for example, Droplets altered the definition of "Adobe Products" by adding the following language to Sec. 1.3:

> Adobe Products shall not include any product, technology or service developed by and for an entity other than Adobe and which is sold by third parties.

Additionally, Droplets added the term "Adobe Customers," which it defined as "any licensed customer or licensed user of Adobe Product" (Sec 1.2), and inserted language by which it granted to Adobe "the right to grant to Adobe Customers" a:

> ... written sublicense under Adobe's right and license under the Licensed Patents solely to purchase and use any Adobe Product in any territory worldwide for such Adobe Customer's internal use and subject to Adobe's standard

---

1. All the exhibits referred to herein are taken from the Declaration of Josh W. Bud win in support of Droplets' opposition to Defendants' motion for summary judgment, September 21, 2012.

2. The draft is headed "Adobe Draft" and 1 intuit that this meant it was prepared by Adobe's representatives, because when Drop-

lets' attorneys at the Susman Godfrey firm redlined drafts, they redlined "Adobe" and inserted "Droplets" in its place. *See collectively* Droplets' Exs. 15–20.

3. Exhibit 16 may have been circulated internally; Exhibit 17 was obviously sent to counsel for Adobe for review. The two exhibits are identical insofar as is relevant here.

terms and conditions. For the avoidance of doubt, Adobe cannot grant to any third parties including without limitation any Adobe Customer any other rights under the Licensed Patent including without limitation any right or license to make, use or sell any product, technology or services used together or combined with any Adobe Product.

This proposal obviously did not fly with Adobe. It sent back a rather different document, which Droplets then redlined (Ex. 18). One can see how Adobe altered Droplets' proposed draft by looking at Exhibit 18 and ignoring Droplets' subsequently inserted redlinings.

Adobe's principal reaction to Droplets' Exhibit 17 was to reject every one of the caveats and limitations that were inserted by Droplets to limit the rights of Adobe's customers—including the one that began "for the avoidance of doubt." Adobe took the opposite approach from Droplets, leaving little or no wiggle room for Droplets to sue its customers—a perfectly understandable position, since the prospect that a customer might be used for using an Adobe product would negatively impact Adobe sales.

First and foremost, Adobe introduced a new term into the Agreement; "Licensed Product." Adobe defined it to mean:

(i) Any and all past, present and future Adobe products, processes, components, software, hardware, technology, data, methods, services, or activities or instructions of any kind singly or in combination with any other products, processes, components, software, hardware, technology, data, methods, services or activities or instructions, or otherwise (collectively "the Adobe Products"); and

(ii) Any and all third party software or applications developed based on or for use with any of the foregoing Adobe Products (including, without

limitation, any Adobe Flex or Flash software or application that runs with or on an Adobe Flash Lite and/or Adobe Air runtime environment) singly or in combination with any Adobe Product or any other products, processes, components, software, hardware, technology, data, methods, services, or activities or instructions (collectively, "Third Party Products"). Licensed Products shall not extend to any other product or service of an Adobe Customer/User that is not a Licensed Product.

The term "Adobe Customer" becomes "Adobe Customer/User," redefined by Adobe as:

any licensed customer, licensed user, developer, distributor or retailer of Adobe or any Licensed Product.

In its draft, Adobe suggested that Droplets grant a license for the use and exploitation of "Licensed Products" both to Adobe and to Adobe Customers/Users. (Sec. 3.3)

Adobe's new approach was not satisfactory to Droplets. Exhibit 18 is Droplets' red-line markup of Adobe's proposal. In that version, Plaintiff:

(1) Amended the definition of "Adobe Customer/User" to strike the words "Adobe or;"

(2) Added the words "distributed by Adobe" to the definition of "Adobe Products;"

(3) Altered Adobe's proposed definition of the second prong of "Licensed Product(s)" to read as follows:

Any and all third party software or applications to the extent the infringing functionality is developed using Adobe Products. Licensed Products shall not extend to third party software or applications if infringement

can be established independently of Adobe Products. Licensed Products shall not extend to third party software or applications that use an Adobe Product for display of content so long as non-Adobe Products may be used to display content as well.

(4) Changed Section 3.3 so that Droplets only granted a license to Adobe, not to Adobe's Customers/Users; but Droplets also granted to Adobe the right to grant to Adobe Customers a limited, nonexclusive, non-transferable sublicense (it need not be written) under Adobe's right and license under the Licensed Patents to make, have made, use, sell, offer for sale, import or otherwise exploit the Licensed Products.

Droplets' approach remained unacceptable to Adobe, which was plainly intent on keeping its customers from being sued for patent infringement based on their use of Licensed Products. Exhibit 19 is Adobe's next pass at an acceptable draft. By this time, the definition of "Adobe Customer/User" was set, but nothing else was agreed. Adobe did the following:

(1) Dropped the words "distributed by Adobe" from Section 1.3(i)'s first prong of the definition of Licensed Products.

(2) Completely rewrote Droplets' proposal for Section 1.3(ii)'s second prong of the definition of Licensed Products to read:

any and all past, present and future third party software or applications developed or written using any Adobe Products, or that use any Adobe Product to practice any invention claimed in the Licensed Patent(s).

(3) Slightly reworded Section 3.3, accepting Droplets' suggestion that it license only Adobe—not Adobe Customers/Users—and that it grant Adobe the right to sublicense Adobe Customers/Users to use the Licensed

Patents "limited to the Licensed Products." ·

Adobe's changes 'rid the draft of nearly everything Droplets had re-introduced to explicitly protect its right to sue Adobe customers.

In Exhibit 20, Droplets tried one last time to limit the definition of Adobe Product by inserting the words "distributed by Adobe" into Section 1.3(i) (the first prong of the definition of "Licensed Products"), as well as by adding to Adobe's proposal for Section 1.3(ii) a second sentence (previously stricken by Adobe) that reads, "Licensed Products shall not extend to third party software or applications if infringement can be established independently of Adobe Products and functionality provided by Adobe Products." This represented Droplets' third attempt to have the Agreement reflect these principles.

Neither change appears in the final document. Instead, Section 1.3(ii) was rewritten in the "either/or" format that appears in the Agreement signed by the parties.

Droplets' also substantially redrafted Section 3.3 by simplifying the license that ran from Droplets to Adobe, so that it ran simply to the Licensed Products, without any mention of "processes, products, components, software, hardware, technology, data, methods, services, or activities or instructions of any kind singly or in combination ..." Adobe accepted this more simplified language.

## II. The Issue on Defendants' Motion for Summary Judgment

Defendants are all "Adobe Customers/Users" within the meaning of the Agreement.

Plaintiff accuses Defendants of infringing its patents in connection with certain specific features (the "Accused Features") that can be found on their respective web sites.

Defendants have moved for summary judgment, on the ground that they are immune from suit for patent infringement in respect of their web sites by virtue of the Settlement and License Agreement. In the Agreement, Droplets granted Adobe Customers/Users the right to practice the patents-in-suit in connection with "Licensed Products," and promised Adobe that Droplets would not sue Adobe Customers/Users for infringement as long as they were using the patents in connection with "Licensed Products." Defendants' argument depends for its force on its contention that the Agreement unambiguously defines "Licensed Product," and that their "web sites" meet one or more of the Agreement's definitions of that term. Indeed, in their reply brief, Defendants assert that the only question raised by their motion for summary judgment is, "Does the Agreement define 'Licensed Product(s)' broadly enough to cover Defendants' websites?"

Defendants contend that their web sites fall within the Agreement's definition of "Licensed Products," for at least two reasons:

*First,* the web sites (or at least portions of the web sites) were created using Adobe products "in combination with ... other products, processes, components, software, hardware, technology, data, methods, services, or activities or instructions." (Sec. 1.3(i))[4]

*Second,* the web sites either consist of or incorporate "third party software or applications [ ] that are developed or written using any. Adobe Products." (Sec. 1.3(ii)(a)).

Droplets opposes the motion for summary judgment. While acknowledging that the covenant not to sue bars it from alleging that certain features on Defen-

dants' web sites infringe its patents, it argues that "Licensed Products" under Section 1.3(i) of the Agreement were intended by it and Adobe to be limited to products sold or distributed by Adobe—whether those products were developed and/or manufactured by Adobe or by third parties (Defendants refer to such products as "Adobe-branded products"). And it contends that "Licensed Products" under Section 1.3(ii)(a) of the Agreement consist of software or applications that were "developed or written" (which they paraphrase as "created or authored") using Adobe "software development tools"—not websites in their entirety, which use a variety of Adobe Products and only portions of which meet any definition of "Licensed Products."

### III. The Issue on Droplets' Motion to Dismiss for Lack of Standing

Droplets also argues that Defendants' counterclaims for the fees they are incurring in defending against this lawsuit must be dismissed, because Adobe Customers/Users are not third party beneficiaries who have any right to enforce the Agreement, including specifically the covenant not to sue. Defendants urge that of course they are third party beneficiaries, because the Agreement was plainly drafted to buy peace, not just for Adobe, but also for its Customers and Users who are using Droplets' patents in connection with Licensed Products.

### CONCLUSIONS OF LAW

### I. Droplets' Motion to Dismiss Defendants' Counterclaims is Denied Because Defendants Are Third Party Beneficiaries of The Settlement and License Agreement

Droplets argues that Defendants do not have standing to bring a counterclaim for

---

**4.** I do not understand any defendant to argue that its web site was creating using only prod-

ucts that are manufactured and/or distributed by Adobe.

breach of the Agreement because they have not pled facts sufficient to establish that they are intended beneficiaries of the Agreement. The parties agree that Texas law governs the Agreement, and that the only parties to the Agreement are Droplets and Adobe.

Droplets makes two arguments in its motion to dismiss.

The first argument is directed towards Defendants' claim that their websites, as a whole, are Licensed Products under Section 1.2(i) as "Adobe Products," and under Section 1.2(ii)(a), because Defendants "use Adobe products and technology in writing and developing their websites." Droplets disputes this, arguing that the websites themselves are not Licensed Products, and that Defendants do not have standing because the "specifically accused features" in its complaint—mere portions of Defendants' websites—are not Licensed Products (and Defendants have not pled as much).

But this is not a standing argument. Rather, it goes to whether Defendants' primary defense to Droplets' patent infringement claim has merit. Droplets' attempt to shoehorn a merits-based argument into standing's shoes is unavailing.[5]

In the alternative, Droplets argues that Defendants fail to plead facts sufficient to show that they are intended beneficiaries to the contract who thereby acquired an independent right to sue to enforce the covenant not to sue. There is no dispute that Defendants fall into the category of "Adobe Customers/Users" under the Agreement, or that, to the extent of their use of Licensed Products, Droplets covenanted and agreed not to sue Adobe Customers/Users for patent infringement.

Nonetheless, Droplets contends that Defendants have no right under Texas law to sue for breach of the Agreement, because any benefit they received from the covenant not to sue is purely incidental to the thrust of the Agreement.

Droplets argues that, under Texas law, an "intended beneficiary" of a contract between the parties must meet the test of either a "donee" or a "creditor" beneficiary. Plaintiff argues Defendants could not possibly be viewed as donee beneficiaries, although it fails to offer any persuasive reason why—merely stating that Defendants cannot "seriously make such a claim." Droplets also argues that Defendants are not creditor beneficiaries, because they have not pled any facts to show that "any duty or legally enforceable commitment," such as an indemnity agreement or contractual obligation, is owed by either Droplets or Adobe to Defendants as a result of the Agreement. Defendants counter that the covenant not to sue Adobe Customers/Users makes them intended beneficiaries of the Agreement regardless of their "creditor" or "donee" status—but nevertheless claim that they qualify as both.

## A. Standard for Determining the Motion

Droplets bring this motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1) for failure to state a claim and lack of standing.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v.*

---

**5.** Droplets attaches to its motion various exhibits in aid of its merits-based argument and asks the Court to engage in "fact-finding" under Fed.R.Civ.P. 12(b)(1) "to determine subject-matter jurisdiction." I decline Droplets' invitation to engage in such merits-based fact-finding—it is not relevant to the issue of standing, nor is it appropriate at this stage of the case.

*Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955; *Iqbal,* 129 S.Ct. at 1950–51.

Finally, in deciding a motion to dismiss, a court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42 (2d Cir.1991)); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996).

## B. Texas Law on Intended Third–Party Beneficiaries

 Under Texas law, third parties have standing and may recover on a contract made between other parties "only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit." *MCI Telecommunications Corp. v. Texas Utilities Elec. Co.,* 995 S.W.2d 647, 651 (Tex.1999). "The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce the contract." *Id.*

 In determining whether a third party can enforce a contract, the "intention of the contracting parties is controlling." *Id.* (citing *Corpus Christi Bank & Trust v. Smith,* 525 S.W.2d 501, 503–04 (Tex.1975)). "A court will not create a third-party beneficiary contract by implication." *Id.* (citing *M.J.R. Corp.,* 760 S.W.2d at 12). The intention to contract or confer a direct benefit to a third party "must be clearly and fully spelled out or enforcement by the third party must be denied." *Id.* (citing *M.J.R. Corp. v. B & B Vending Co.,* 760 S.W.2d 4, 12 (Tex.App.-Dallas 1988, writ denied)).

 A party is "presumed to contract only for its own benefit," and therefore, "contract law presumes that parties to a contract did not intend to confer a benefit on third parties." *ConocoPhillips Co. v. Graham,* No. 11 Civ. 00503(HB), 2012 WL 1059084, at *4 (Tex.App. Mar. 29, 2012) (citing *In re Bayer Materialscience, L.L.C.,* 265 S.W.3d 452, 456 (Tex.App.-Houston [1st Dist.] 2007) and *MCI,* 995 S.W.2d at 652). "This presumption has less force when ... the contractual rights relate to dispute resolution of specific claims, as to which a contracting party owes a duty of indemnification and defense

to the third-party claiming the benefit." *Id.*

▮ The parties' intent is determined by examining the actual agreement between the parties. *See Stine v. Stewart,* 80 S.W.3d 586, 589 (Tex.2002); *see also Alvarado v. Lexington Ins. Co.,* 389 S.W.3d 544, 552 (Tex.App.2012). Under Texas contract law principles, a court must examine and consider the whole agreement in determining intent. *Id.* (citing *In re Serv. Corp. Int'l,* 355 S.W.3d 655, 661 (Tex. 2011)). Courts attempt to harmonize and give effect to all the provisions so that none will be rendered meaningless. *Id.*

▮ A third-party beneficiary does not have to show that the signatories executed the contract "*solely* to benefit her as a non-contracting party." *Stine,* 80 S.W.3d at 591. "Rather, the focus is on whether the contracting parties intended, at least in part, to discharge an obligation owed to the third party." *Id.* (citing *MCI,* 995 S.W.2d at 651). Moreover, a third party can be a third party beneficiary even if the contract does not identify that party by name. *See In re Citgo Petroleum Corp.,* 248 S.W.3d 769, 776 (Tex.App.-Beaumont 2008, orig. proceeding [mand. denied]). A third party beneficiary may be identified in the agreement by a class or category of persons, all of whom may not be known to the contracting parties at the time of execution. *ConocoPhillips Co. v. Graham,* No. 11 Civ. 00503, 2012 WL 1059084, at *6 (Tex.App.-Houston [1st Dist.] March 29, 2012, no pet.); *see also In re Citgo,* 248 S.W.3d at 776 ("Although the contract does not name Citgo specifically, the agreement is sufficiently clear to establish that the parties intended to cover entities in this category and the record establishes Citgo is a customer or client of [the signatory].").

Most Texas cases hold that, to qualify as a third party beneficiary, the third party must show that he is either a "donee" or a "creditor" beneficiary of the contract. *MCI,* 995 S.W.2d at 651. "A [party] is a donee beneficiary if the performance promised will come to him as a pure donation." *S. Texas Water Auth. v. Lomas,* 223 S.W.3d 304, 306 (Tex.2007). A party is a creditor beneficiary if, under the agreement, the performance promised "will come to him in satisfaction of a legal duty owed to him by the promisee." *Stine,* 80 S.W.3d at 590. This duty may be "an indebtedness, contractual obligation or other legally enforceable commitment owed to the third party." *Id.* Courts have generally found indemnity agreements between the third party and one of the parties to the agreement sufficient to satisfy the "legal duty" requirement. "To qualify as a creditor beneficiary, the maker of the contract ... must not only have intended to confer a benefit upon the third party ... but it also must have intended for the third-party to have the right to enforce the agreement." *Bayer,* 265 S.W.3d at 456–57.

Defendants argue that recent Texas cases do not explicitly refer to the donee/creditor beneficiary framework, and instead appear to focus on the more general principles discussed previously—namely, that the parties intended to secure some benefit to the third party and entered into the contract for the direct benefit of the third party. Defendants claim, therefore, that there is no need to show a "legal duty" owing by one of the signatories to the contract, Droplets or Adobe, to Adobe Customers/Users, in order to demonstrate third-party beneficiary status. Plaintiff disputes this.

Defendants rely principally on cases in which one of the parties to a contract owes a duty of indemnity to a third party, *ConocoPhillips* and *In re Citgo.* Even though those cases do not explicitly refer to the "creditor beneficiary" doctrine, they are classic examples of "creditor beneficiary"

third party beneficiary actions. In essence, they stand for the proposition that an indemnity agreement between a third-party and a contracting party (which require the contracting party to indemnify the third party if the "third party" right to the benefit at issue is challenged) is sufficient to meet the "legal duty" requirement of the creditor beneficiary doctrine—whether or not the term "creditor beneficiary" is actually used. For reasons that will become clear, the existence of an indemnity running from Adobe to its customers (a fact that cannot be ascertained from the four corners of the Agreement) is not central to resolving the issue of third party beneficiary status on this motion to dismiss. I nonetheless review the cases here, since the parties' briefs focus on them at length and their analysis of the contract language remains relevant to this motion.

In *ConocoPhillips*, the contract at issue was an arbitration agreement between JVIC, an independent contractor, and its employees. *ConocoPhillips*, 2012 WL 1059084, at *1. In the action, several of JVIC's employees sued ConocoPhillips, a third-party property owner, for injuries they sustained while working on Conoco-Phillips' property. *Id.* ConocoPhillips claimed to be a third-party beneficiary of the arbitration agreement between JVIC and its employees and sought to force the employees to arbitrate their claims. *Id.*

The *ConocoPhillips* court gave three reasons for its finding that ConocoPhillips was an intended third-party beneficiary to the arbitration agreement. First, the language in the arbitration agreement identified and expressly mandated arbitration of a category of claims—entirely separate from those between JVIC and its own employees—that were between JVIC employees and various categories of third parties. *ConocoPhillips*, 2012 WL 1059084, at *6. The court reasoned that the

obligation to arbitrate such claims "would have no effect if it could not be enforced by a third-party." *Id.* Second, the presumption against finding that a contract intended to confer a benefit on third parties "has less force" where the contract rights "relate to dispute resolution of specific claims, as to which a contracting party owes a duty of indemnification and defense to the third-party claiming the benefit." *Id.* at *7. The court noted, "In light of its indemnity and defense obligations to Conoco-Phillips, JVIC, by conferring a right to enforce these arbitration agreements on ConocoPhillips, benefitted itself." *Id.* Third, arbitration of the employees' claims against ConocoPhillips was essential, rather than incidental, to JVIC's enjoyment of the full benefit of its contractual arbitration rights. *Id.*

Under a similar fact pattern, the court in *In re Citgo* made similar findings, observing that an indemnity obligation running from the contracting party/employer to the third-party property owner "suggests one reason" the contracting party/employer Pat Tank would intend to give Citgo, the putative third-party beneficiary, the right to enforce the arbitration agreement between Pat Tank and its employees—because the employees' claims "may ultimately, though indirectly, be paid by Pat Tank under the indemnity contract." *In re Citgo*, 248 S.W.3d at 777. The court concluded that these circumstances indicated "an intent to give Citgo the benefit of [the employee's] promise to arbitrate." *Id.*

In contrast, in an earlier case also under a similar fact pattern, the court in *In re Bayer* held that the third-party property owner, Bayer, failed to demonstrate that it was an intended third-party beneficiary of the arbitration agreement between the employer, Brock, and its employees. *Bayer*, 265 S.W.3d at 458. Bayer failed to show

that the contracting party/employer Brock had any "legal obligation" to putative third-party beneficiary Bayer to require Brock employees to arbitrate disputes they might have with Bayer, or that including Bayer in the arbitration agreement was "necessary to satisfy any legal duty." *Id.* at 457.

The *ConocoPhillips* and *In re Citgo* courts both distinguished *Bayer* because, in that case, no indemnity obligation existed between the contracting party/employer and the putative third-party beneficiary. *ConocoPhillips,* 2012 WL 1059084, at *7; *In re Citgo,* 248 S.W.3d at 777. In *ConocoPhillips,* the court also distinguished *Bayer* on the language of the contract, noting that in *Bayer,* the language was "broad enough to include claims between employees and third parties and not the employer but did not separately provide for arbitration of such claims." *Conoco-Phillips,* 2012 WL 1059084, at *7.

Defendants also rely on two other cases that did not involve indemnity and do not appear to apply the "creditor beneficiary" doctrine. In *Basic Capital Management, Inc. v. Dynex Commercial, Inc.,* 348 S.W.3d 894 (Tex.2011), the contract at issue was a financing agreement entered into between Basic Capital Management ("Basic") and Dynex, in which, *inter alia,* Dynex committed to lending $160 million over the course of two years to certain "single-asset, bankruptcy-remote entities" ("SABREs"), which would be proposed by Basic and specifically identified at a later date, for investments also to be identified at a later date. *Basic,* 348 S.W.3d at 895–98. Because of the nature of SABREs as single-asset entities—intended to protect a lender so that, in the event of default, the collateral can be recovered more easily than from a debtor with multiple assets and multiple creditors—a SABRE would not be created until an investment opportunity presented itself. *Id.* at 896, 900.

The SABREs were to be owned by third parties American Realty Trust, Inc. ("ART") and Transcontinental Realty Investors, Inc. ("TCI")—real investment trusts which were managed by contracting party Basic and in which Basic also owned stock. *Id.* at 896–97.

When market interest rates rose, the terms of the agreement became unfavorable to contracting party Dynex, and it refused to provide further funding to the SABREs. *Id.* at 897. ART and TCI sued for breach of the $160 million "Commitment," claiming to be intended third-party beneficiaries. *Id.* at 897. Dynex moved for summary judgment on the issue. *Id.* at 898.

The court found that ART and TCI were third-party beneficiaries to the contract— even though the SABREs themselves appeared on the face of the agreement to be the more "direct" third-party beneficiaries. *Id.* at 900. The court noted that, while only Dynex and Basic had signed the agreement, "Dynex knew that the purpose of the Commitment was to secure future financing for [putative third-party beneficiaries] ART and TCI, real estate investment trusts that Basic managed and in which it held an ownership interest." Dynex also knew that Basic was never intended to be the borrower. *Id.* Moreover, the requirement that the SABREs be acceptable to Dynex was for Dynex's benefit: "SABRE-borrowers provided a mechanism for ART and TCI to hold investment property directly but in a way that would provide Dynex greater security." *Id.* Thus, "if [the contracting parties] did not intend the Commitment to benefit [the putative third-party beneficiaries ART and TCI] directly, then the Commitment had no purpose whatever." *Id.*

The court did not refer to the creditor beneficiary doctrine, nor did it specifically identify any "legal duty" owed by either of

the contracting parties to the putative third-party beneficiaries ART and TCI. Plaintiff argues that the court nonetheless relied on the fact that ART and TCI were managed and owned by contracting party Basic to show that they were "creditor" beneficiaries, even if it did not use that term. But that is not what the court did. The court found that the language of the Commitment "clearly and fully spelled out" the benefit to ART and TCI, and that the purpose of the contract was to secure the benefit of future financing to ART and TCI. *Id.* at 900–01. That was enough to secure third-party beneficiary status for them.

In *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672 (Tex.2006), the manufacturer of a mobile home was deemed to be an intended third-party beneficiary of an agreement requiring arbitration between the retailer that sold the mobile home and the customer who bought the mobile home. *Palm Harbor Homes*, 195 S.W.3d at 677. The supreme court noted that the arbitration agreement provided that it "inure[d] to the benefit of the manufacturer of the Home," and that "[b]y its own terms, the agreement was entered into, in part, directly for the manufacturer's benefit." *Palm Harbor Homes, Inc.*, 195 S.W.3d at 677. The supreme court, however, did not discuss whether a "legal duty" was owed to the manufacturer by either of the contracting parties.

### C. Defendants Plead Sufficient Facts to Show Standing as Third–Party Beneficiaries to the Agreement

█ Under Texas law, I must examine the actual agreement between the contracting parties to determine whether they (Droplets and Adobe) intended to contract or confer a direct benefit on a third party (Defendants).

The Agreement explicitly defines a class of third parties as "Adobe Customers/Users" and grants certain benefits related to those parties, including a release from Droplets, a covenant not to sue by Droplets, and a license form Droplets.

From the contract language quoted above, the Agreement:

- *Releases* all past, present or future claims against **"Adobe Customer/Users with respect to any and all Licensed Products"** (Sec. 2.1) (emphasis added),

- **"grants to Adobe** ... [a] *covenant not to sue* **Adobe Customers/Users with respect to any and all Licensed Products"** (Sec. 3.1) (emphasis added), and

- **"grants to Adobe Customers** a worldwide, irrevocable, fully paid-up, royalty-free, perpetual, limited to the Licensed Products, nonexclusive, nontransferable *license* under the Licensed Patents to make, have made, use, sell offer for sale, import or otherwise exploit the Licensed Products." (Sec. 3.3) (emphasis added).

It is clear that this Agreement intended to secure "some benefit" to Adobe Customers/Users—quite a few, actually: a release, a license, and a covenant not to sue. As was true in *ConocoPhillips*, the Agreement explicitly defines a class of third parties upon whom, via the Agreement, Droplets confers direct benefits that are independent of any benefits conferred by Droplets on Adobe, the other contracting party. *ConocoPhillips*, 2012 WL 1059084, at *6; *see also Alvarado*, 389 S.W.3d at 559–61 (concluding that language in an endorsement to an insurance policy made clearly apparent the contracting parties' intent to confer a direct benefit to a third party "homeowner," where the endorsement explicitly granted "Special Broad Form Homeowners Coverage" to the homeowner and defined "insured" as "[y]ou and residents

of your household," separate and apart from the contracting party/mortgagee of the home that also received benefits under the policy). Droplets' release of claims against Adobe Customers/Users is specific to the Customers/Users and separate from its release of claims against Adobe. The non-exclusive use license is granted directly to Adobe Customers/Users; it is not simply the pass-through benefit of a license granted to Adobe. And while the covenant not to sue runs to Adobe for the benefit of its customers—not directly to the Customers/Users—the Customers/Users are the parties who most directly benefit from that promise. For Droplets to argue (as it does) that Defendants are not third-party beneficiaries because Plaintiff owes no legal duty to Adobe Customers/Users, when it is obligated to grant them a patent license and to release them from claims arising out of Licensed Products (as well as not to sue them), flies in the face of the Agreement's express terms.

Not only does Droplets confer direct benefits on Defendants via the Agreement, but the Agreement contains no provision that denies Defendants either third-party beneficiary status or their own enforcement rights. The analysis of contract language in several Texas cases is instructive here. In *MCI*, TU, an electric service company, brought a cause of action against MCI, as an intended third-party beneficiary of a contract between MCI and MoPac, the owner of a railroad. *MCI*, 995 S.W.2d at 648–49. TU's predecessor and MoPac's predecessor, the owner of the railroad, had entered into a "wire line license," whereby TU's predecessor was given the nonexclusive right to install an electric transmission line on the railroad's right-of-way. *Id.* The installation was supported by steel poles along the railroad. *Id.* Over a decade later, MoPac and MCI entered into a contract by which MoPac granted MCI the right to construct a fiber optic system

along the same right-of-way. *Id.* TU alleged that the system damaged its steel poles and brought a cause of action. *Id.*

The contract between MCI and MoPac addressed the prior rights of third parties in the railroad right-of-way, including the prior rights of licensee such as TU:

> "MCI shall secure such permission as may be necessary on account of any other existing rights in any third party (including, without limitation, rights of ... licensees ...).... MCI hereby agrees to exercise the herein granted rights in such a manner as not to interfere in any way with any existing prior rights."

*Id.* at 649.

The court held that TU, although the holder of "other existing rights" was not a third party beneficiary. But it did so because unambiguous language in another provision stated, "[N]either this Agreement, nor any term or provision hereof, nor any inclusion by reference, shall be construed as being for the benefit of any party not in signatory hereto." *Id.* at 650. The court emphasized that it had to interpret the contract so as to give effect to all provisions of the contract, so that none would be rendered meaningless. *Id.* at 651. Conferring third-party beneficiary status on TU—notwithstanding that TU was entitled to the benefit of certain protection as a pre-existing licensee—would read the "no third-party beneficiary" clause out of the contract.

In *Senna Hills, Ltd. v. Sonterra Energy Corp.*, 03–08–00219–CV, 2010 WL 143408 (Tex.App. Jan. 15, 2010), however, a provision similar but not identical to the one in *MCI* did not preclude third party beneficiary status. *Senna Hills*, 2010 WL 143408, at *11, *14. The contract at issue had a "no third party beneficiaries" term, but that term was prefaced by the clause "Except as otherwise provided in this

Agreement . . . ." *Id.* The scheme of the Agreement "otherwise provided" intended beneficiary status on the third party.

The Agreement in this case does not include *any* "no third party beneficiaries" term, as was the case in *MCI;* it does not even include the qualified language of *Senna.* Instead, the Agreement grants explicit rights to Adobe Customers/Users, separate and apart from the signatories to the contract. Indeed, by including a clause that expressly declines to grant any license "by implication, estoppels, or otherwise other than under the Licensed Patent(s) nor with respect to anything other than the Licensed Product" (Agreement § 3.5), Droplets and Adobe acknowledged that any and all rights Adobe Customers/Users had in respect of Licensed Products were conferred by virtue of the Agreement—not something else. It is hard to see how Adobe Customers/Users could fail to qualify as third party beneficiaries of the Agreement.

Droplets argues that the contracting parties did not intend for Defendants to have the right to enforce the Agreement, since the Agreement does not include any express provision allowing for enforcement by any third parties. But Texas law requires only that the contracting parties intended for the third parties to have the right to enforce the contract, as demonstrated by the benefits granted in the contract and the circumstances of the parties' relationships—not an express provision to that effect. *See In re Citgo,* 248 S.W.3d at 777; *Bayer,* 265 S.W.3d at 456–57.

 To the extent Droplets' may suggest that only Adobe can enforce the covenant not to sue its Customers/Users (because the explicit covenant not to sue Adobe Customers/Users runs to Adobe) the suggestion fails because of the nature of patent licenses. In Section 3.3 of the Agreement, Droplets grants *directly to Adobe Customers/Users* a license under

the Licensed Patents (limited to the Licensed Products) to "make, have made, use . . . or otherwise exploit the Licensed Products." This license also· provides that "No Claim of direct or indirect infringement or misappropriation of any patent or other intellectual property right may be based in whole or in part on any evidence of the existence, operation, or effect of a Licensed Product." (Sec. 3.3) Under settled law "a non-exclusive patent license is equivalent to a covenant not to sue." *TransCore, LP v. Electronic Transaction Consultants Corp.,* 563 F.3d 1271 (2009) (citing *De Forest Radio Telephone & Telegraph Co. v. United States,* 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927) and collecting Federal Circuit cases). The *TransCore* court quoted at length:

> As a threshold matter, a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee. Even if couched in terms of "[l]icensee is given the right to make, use, or sell X," the agreement cannot convey that absolute right because not even the patentee of X is given that right. His right is merely one to exclude others from making, using or selling X. Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents. In any event, patent license agreements can be written to convey different scopes of promises not to sue, e.g., a promise not to sue under a· specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.

*TransCore,* 563 F.3d at 1275–76 (quoting *Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft,* 829 F.2d 1075, 1081 (Fed.Cir.1987)).

So the license that runs directly from Droplets to Defendants (as Adobe Custom-

ers/Users) by virtue of the Agreement is more appropriately thought of as a covenant not to sue with respect to Licensed Products that runs directly from Droplets to the Customers/Users. The Agreement thus creates a duty not to sue that is owed directly by Droplets to Adobe Customers/Users who are using Licensed Products. Those beneficiaries can enforce it; it is hard to see who else would have standing to do so (certainly not Adobe since the benefits conferred by the license directly to the Customers/Users do not derive from the covenant made by Droplets to Adobe).

There is no need even to consider whether the Adobe Customers/Users can enforce the separate covenant not to sue them that runs from Droplets to Adobe. Nonetheless, I conclude that Texas law would allow Defendants to enforce that covenant as well. While the benefits of the explicit covenant not to sue Adobe Customers/Users that runs from Droplets to Adobe plainly benefit Adobe—after all, nothing deters sales like the threat that the customer will be sued—it also confers a benefit directly on the Customers/Users themselves. The parties' negotiating history demonstrates beyond peradventure that Adobe was deeply concerned about insuring that the purchasers and users of both Adobe products and Adobe Products would not be sued; Adobe's insistence qualifies as "gift" to its third-party customers who thereby qualify as donee beneficiaries. There is no reason to believe that Adobe was interested in having to enforce the covenant not to sue on behalf of its customers, rather than allowing the parties directly affected (any Adobe Customers/Users who found themselves sued by Droplets) to enforce the covenant. Adobe, of course, benefits from this, but as has been pointed out, Defendants do not have to show that the signatories to the contract intended "solely" to benefit the third party beneficiaries. *Stine v. Stewart*, 80 S.W.3d 586, 591 (Tex.2002).

Droplets argues that Defendants fail to allege in their counterclaim the existence of an indemnity running from Adobe to them, which would clearly constitute a "legal duty" within the meaning of cases like *ConocoPhillips* and *Citgo*. It is true that Defendants do not allege the existence of such indemnification agreements in the pleading. In the papers supporting their motion for summary judgment, several defendants assert they have indemnities from Adobe in their license agreements with Adobe. I need not consider that evidence on this motion, which is outside the four corners of the pleading to which this motion is addressed. However, were the issue presented in the context of a motion for summary judgment, rather than a motion to dismiss, indemnities running from Adobe to Defendants (assuming they exist) would be yet another reason to conclude that Defendants were intended to be third party beneficiaries of the covenant not to sue that appears in Section 3.1 of the Agreement.

Droplets' motion to dismiss the Defendants' counterclaims is, therefore, denied.

## II. Defendants' Motion for Summary Judgment

### A. Standard for Determining the Motion

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are predestined to result in directed verdict. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997).

## B. Interpretation of "Licensed Products" in the Settlement and License Agreement

The principles of contract construction need not long detain us. They are the same in every jurisdiction.

 The primary concern when construing a written contract is to ascertain "the true intention of the parties *as expressed in the instrument.*" *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex.2010) (emphasis added). The court is to be guided by the contents of the writing—the words used by the parties—and may not

consider evidence outside the four corners of an integrated writing to modify or vary the plain meaning of the words used, only to clear up an ambiguity. *Sun Oil v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981). Ambiguity does not arise merely because the parties interpret the contract differently. *Vincent v. Bank of America, N.A.*, 109 S.W.3d 856, 866 (Tex.App.-Dallas 2003).

 The facts and circumstances surrounding a contract's execution, including the negotiations of the parties, may have some relevance in ascertaining the dominant purpose and intent of the parties and confirming that the words mean what they say. *Sun Oil*, 626 S.W.2d at 731 ("We are to take the wording of the instrument, considering the same in light of the surrounding circumstances, and apply the pertinent rules of construction thereto"). Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language; it cannot substitute for the plain meaning of the words themselves or be used to add to or vary what they do or do not say. *Id.*

 Droplets' position is that the Agreement defines three specific categories of "Licensed Products"—a concept with which no one can quarrel—and that Defendants' use of Droplets' patented invention on their web sites falls within none of them. Both sides agree that Section 1.3(ii)(b) is of no relevance to the facts of this case, so we will examine the sections that are relevant: Sections 1.3(i) and 1.3(ii)(a). For reasons that will become apparent, I do so in reverse order.

### 1. Section 1.3(ii)(a)

As finally adopted, Section 1.3(ii)(a) defines Licensed Products to include "any and all past, present and future third party software or applications . . . that are devel-

oped or written using any Adobe Products."

Defendants argue that their web sites are "Licensed Products" because the web sites are "software or applications" that were "developed or written using any Adobe Products." There does not appear to be any dispute that the web sites, or at least certain features of the web sites, were created using Adobe Products—indeed, according to the undisputed evidence, they were created using Adobe *products* (lower case, meaning products created, branded and marketed by Adobe).

Droplets argues that the definition of Licensed Products found in Section 1.3(ii)(a) applies only to a small subset of Adobe products (lower case "p"), such as Flex, Flash Builder, and Air. It makes this argument based on the "developed or written" language in the section, and it relies on the parties' negotiating history to bolster its position.

The plain language of the section is broad and all-encompassing. If something qualifies as "software" or an "application," and it was "developed or written using *any* Adobe Products," then it is a Licensed Product (emphasis added).

Nonetheless—and despite the use of the word "any" in the phrase "developed or written using any Adobe Products"— Droplets argues that the words "Adobe Products" in that phrase are necessarily limited to Adobe Products that can be used to "develop or write" "software" or "applications." Apparently, only some of Adobe's products—such as BlazeDS, Dreamweaver, Flash (server), Flash Builder, Flex, Flex Builder, LiveCycle, and Air— can be used to "develop" or "write" software or applications. Droplets urges that the other products—including products used in or on Defendants' web sites (*e.g.,* Illustrator or Photoshop)—are incapable of "developing" or "writing" software or applications, so the use of those products would not transform a website that incorporates them into a Licensed Product.

This argument depends for its force on what the words "develop," "write," "software" "applications" and "web site" mean. And when one examines the meaning of those terms, Droplets' argument appears to have considerable force.

The only "Licensed Products" Defendants claim are their web sites. A "web site," according to the MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (6th ed. 2003) is:

> A collection of thematically related, hyperlinked World Wide Web services, mainly HTML documents, usually located on a specific Web server and reachable through a URL assigned to the site.

The ordinary meaning of "develop" is "to create or produce especially by deliberate effort over time" as in "develop new ways of doing business" or "develop software" (Merriam–Webster Online Dictionary and Thesaurus, http://www.merriam-webster.com/dictionary/develop), or "to bring from latency to or toward fulfillment" (THE AMERICAN HERITAGE COLLEGE DICTIONARY (4th ed. 2002)); while "write," in the context of computerized applications, means "a command directing that an output operation be performed" (MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, *supra* ). Nothing in the record and nothing in the negotiating history thus far provided to the Court suggests that Droplets and Adobe did not intend to use those simple verbs in accordance with their ordinary meaning in the context of the relevant industry.

According to Defendants, their web sites were "developed or written" using certain Adobe Products—products that are identified on pages 5–12 of Defendants' moving brief. Therefore, they argue, their web sites are "Licensed Products."

But that is true only if "web sites" meet the definition of "software" or "application." Section 1.3(ii)(a) does not say that a Licensed Product is "any *thing* that is developed or written using any Adobe Product," and it certainly does not mention web sites specifically. Only "software" or "an application" that is "developed or written using Adobe Products"—that is using Adobe Products—meets the definition of a Licensed Product under Section 1.3(ii)(a). So unless web sites qualify as "software" or "applications," the fact that Adobe Products were used in their creation or can be accessed to take advantage of particular web site functions is irrelevant for purposes of Section 1.3(ii)(a) of the Agreement.

Defendants blithely insist that web sites are "software" or "applications;" Droplets argues that they are not. Neither side fleshes out its argument very fully; indeed. Defendants do not flesh theirs out at all.

So what is "software?" And what is an "application?"

Again, nothing in the Agreement or in the negotiating history leading to its adoption suggests that the Adobe and Droplets intended those words to mean anything extraordinary, so we look once more to their dictionary definitions. THE MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, *supra*, defines "software" as:

> The totality of programs usable on a particular kind of computer, together with the documentation associated with a computer or program, such as manuals, diagrams, and operating instructions.

Under that accepted definition, a web site—a collection of thematically related hyperlinked World Wide Web Services— would not seem to be "software." The thematically related services that appear on a web site, or that can be accessed therefrom via hyperlinking, were undoubt-edly created using "software," but the services are not themselves the software that was used to create them—any more than web sites are the "hardware" on which the hyperlinked services can be displayed to end users.

An "application," according to the same dictionary, is

> A computer program that performs a specific task, for example, a word processor, a Web browser, or a spread sheet.

MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, *supra*. Under that definition, a web site would not qualify as an "application," because a web site is not a computer program that performs a specific task. The web site might contain or house "applications," but that would not make the site itself an "application."

If a web site is neither "software" nor "applications," then the fact that it runs Adobe Products (like Flash or Flex) would be of no moment for purposes of Section 1.3(a)(ii), because only "software" or "applications" that are "developed or written using any Adobe Product qualify as Licensed Products." Equally, Adobe Products that cannot be used to "develop" applications or to "write" software cannot be relied on to fit an item within the definition of "Adobe Products" for purposes of Section 1.3(ii)(a).

It appears further to follow from the accepted technical definition of "application" that a web site, defined as a "collection of World Wide Web services," consists of many separate component parts, which undoubtedly perform many different specific tasks or have different functions. Some of these parts may be "applications." Any particular "application" on Defendants' web sites might infringe on Droplets' patents by pirating Droplets' technology. But if that particular application were "developed or written" without using

any "Adobe Products" (defined as products that can be used to "write or develop" "software" or "applications"), it would not be subject to the covenant not to sue, because that application would not be a Licensed Product. The fact that other "applications" on the web site may have been "developed" or "written" using "any Adobe Products" would be of no moment, since each application—each program that performs a specific task—would have to be looked at as a separate "product" for purposes of Section 1.3(ii)(a). This suggests that Droplets can accuse particular aspects of the web sites—"Accused Features"—of infringement. Which, of course, is precisely what Droplets has done; it says that certain applications contained in or on Defendants' web sites were not developed using Adobe Products, but infringe Droplets' patents.

If I am correct about all this, Section 1.3(ii)(a), would not shield Defendants from suit simply because their web sites design logos with Illustrator, or edit images with Photoshop. An Adobe Product would only bring an Adobe Customer/User within the ambit of that particular section if it can be used to "write" or "develop" aspects of a web site that qualify as "software" or "applications" under the commonly understood meaning of those terms. If an Accused Features of Defendants' web sites is not "software" or an "application," then that Accused Feature is not a "Licensed Product" for purposes of Section 1.3(ii)(a) and the covenant not to sue does not protects Defendants. The merits of Droplets' infringement accusation must, of course, abide another day.

And so, ultimately, must the resolution of this question. The foregoing analysis goes well beyond the parameters of the Agreement and the evidence that has been submitted by the parties in connection with the motion for summary judgment; it depends for its force on other material (dictionary definitions) and may well require expert testimony to resolve. Neither side is entitled to summary judgment on the record presently before the Court. 1 include this discussion to illustrate what I understand the issue to be—my understanding being perhaps different from that of (at least some of) the parties.

**2. Section 1.3(i)**

Section 1.3 provides a separate definition of "Licensed Product" under which Defendants also insist their web sites fall. It defines "Licensed Products" as:

> Any and all past, present and future Adobe products, processes, components, software, hardware, technology, data, methods, services, or activities or instructions of any kind singly or in combination with any other products, processes, components, software, hardware, technology, data, methods, services, or activities or instructions (collectively, *"Adobe Products"*)

Droplets first argues that the definition of Licensed Products found in Section 1.3(1) covers only a product made by Adobe (an Adobe product (lower-case "p")) standing alone, or Adobe product bundled with some non-Adobe product and then sold or brought into the market by Adobe. (Droplets' Br. at 12–13.) Droplets argues that this conclusion follows from the fact that such products (what Defendants refer to as "Adobe-branded products") are collectively referred to as "Adobe Products" in the Agreement.

As to this argument, Droplets could not possibly be more wrong. Not only does the plain language of the Agreement fail to support such a restrictive interpretation of the definition of the defined term "Adobe Products," but the parties' negotiating history—which Droplets has conveniently brought to the court's attention—shows that Droplets made repeated efforts to confine "Adobe Products" to items that

were marketed or distributed by Adobe, only to be rebuffed over and over again until it dropped the matter in order to get a settlement to which Adobe would agree.

Nothing in the words used in Section 1.3(i) says, or even suggests, that the definition of Licensed Products is limited to products made by Adobe or combinations of Adobe and non-Adobe products that are combined by Adobe. Section 1.3(i) defines Licensed Products as "any and all past, present and future Adobe products ... of any kind, singly or in combination with any other products : .." The document *is completely silent about who might do the combining.*

■ Furthermore, the fact that such products, singly or in combination, are referred to as "Adobe Products" does not mean, as Plaintiff argues, that the term "Licensed Products" extends only to products that are, in essence, branded with Adobe's name. As Defendants argue, the words "Adobe Products" do not limit the preceding phrase; rather, they are defined by the preceding phrase. There is absolutely no basis for the Court to read into the contract the type of limitation proposed by Adobe. A contract must be interpreted "according to the obvious import of its language without resorting to a subtle or forced construction." *King v. Associated Air Ctr., Inc.,* 05–91–00305–CV, 1991 WL 284483 (Tex.App. Dec. 30, 1991).

■ If there were any doubt about that conclusion, the parties' negotiations—the relevant portions of which are set forth exhaustively above—would end it. The negotiating history reveals that Adobe resisted at every turn Droplets' repeated efforts to restrict the term "Licensed Products" to products and combinations of products that were marketed by Adobe. Droplets tried without success to insert language to that effect into Section 1.3(i) *no fewer than three times.* (*See* Background Part I.C, *infra., and especially*

Exs. 17, 18 (redlined) and 20.) Adobe's repeated rebuffing of Droplets' effort to place this explicit limitation in the Agreement demolishes any suggestion that Adobe understood Section 1.3(i) to be so limited. I cannot possibly read back into the contract words that were repeatedly stricken from the document. "If the contract is unambiguous, the court must enforce the contract as written." *Transcon. Gas Pipeline Corp. v. Texaco, Inc.,* 35 S.W.3d 658, 665 (Tex.App.2000). "Interpolating, omitting, or disregarding specific words, symbols, punctuation, or the like" is only permitted where the agreement "demonstrates an intention which makes that interpretation or construction appropriate." 11 Williston on Contracts § 32:9 (4th ed.). That is simply not the case here.

So we return to Defendants' fundamental contention: their web sites are "Licensed Products." In order to fall within the definition of "Licensed Product(s) in Section 1.3(i), a "web site" would have to be either a "product[ ], process[ ], component[ ], software, hardware, technology, data, method[ ], service[ ] or activit[y] ..." As we have seen (*see* Discussion Part II. B.1 *infra.*), the McGraw-Hill Dictionary of Scientific and Technical Terms, *supra,* defines a web site as a "collection" of thematically related World Wide Web "services." So a web site might well fall comfortably within the Section 1.3(i) definition of "Licensed Product."

But of course Defendants do not claim that their web sites are Licensed Products because the websites are "Adobe products"—that is, products manufactured and marketed by Adobe. Rather, Defendants argue, the web sites are (or, actually, consist of) Adobe products "in combination with" products, processes, components, software, hardware, technology, data methods, services or activities that were developed by parties other than Adobe.

To ascertain whether that argument is correct, we need to understand the meaning of the phrase "in combination with."

The DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS is of no help when it comes to the meaning of the phrase "in combination with." The only definition of "combination" in the dictionary is related to mathematics (a selection of one or more of the elements of a given set without regard to order) that bears no relation to the use of the word in the Agreement. *Id.* The common meaning of the verb "combine" is "to bring into a state of unity; merge." THE AMERICAN HERITAGE COLLEGE DICTIONARY, *supra.* An alternative definition is "to join (two or more substances) to make a single substance; mix." *Id.* The corresponding meaning of "combination" is "the act or state of being combined" or "the result of combining." *Id.* In other words, the noun is defined in terms of the verb.

Under this standard dictionary definition, "combine" or "combination" does not encompass the two products used alongside each other in ways that do not unite them or obscure their individual characteristics. If I may use a simple example: a painter may create a work of art using red and blue paint in a painting in two ways. She may paint part of the canvas red and part blue, such that the two colors remain distinct, even though they are part of a single painting. Or she may paint the same area of the canvas using both colors, in which case the red and blue would lose their distinctive individual redness and blueness and become a shade of purple. The former use might or might not create a "combination" under the standard dictionary definition; the latter undoubtedly does.

And therein lies the problem. Neither from the plain language of the Agreement nor from the negotiating history can I discern what it means for an Adobe product (lower case "p") to be "in combination with" products, processes, components, software, hardware, technology, data, methods services or activities or instructions that come from other sources. Do the Adobe products (*i.e.*, those manufactured by Adobe) have to be so intermixed with other products that they lose their distinctiveness in order to be Licensed Products under the "in combination with" rubric? That is what the definition of the word "combination" suggests. Or is it enough that, on Defendants' web sites, both Adobe products (like Reader or Photoshop or Illustrator) and computer products from other sources can be accessed and used to perform various operations—which seems to be Defendants' position?

Unfortunately, neither side in this litigation focuses on what it means for Adobe products to be "in combination with" the products or technology of some other supplier or manufacturer. Defendants, frankly, blow right by the issue, while Droplets never addresses it squarely. Droplets does argue that Defendants effectively try to broaden the phrase "in combination with" by altering it so that it means "used in combination with"—a construction that was included in an early draft of the Agreement and then dropped.[6] But telling me what "in combination with" does not mean is only marginally helpful as I try to figure out what it does mean.[7]

---

**6.** The "used in combination with" language appeared in an earlier draft of Section 1.3(ii): "(ii) any and all third party software or applications developed *based on or for use with any of the foregoing Adobe Products* .... *singly or in combination with any Adobe Product* or any other products, processes, components, software, hardware, technology, data, methods, services, or activities or instructions (collectively, "Third Party Products") ...."

**7.** Droplets argues that Defendants' interpolation of the concept of "using" Adobe Products to create their web sites into Section 1.3(i)

In sum, Section 1.3(i) is ambiguous, for a reason with which neither party comes to grips. That being so, I cannot say whether Defendants' web sites are "Licensed Products" within the meaning of that section, such that they would be protected by Droplets' covenant not to sue Adobe Customers/Users.

Since Section 1.3(i) is ambiguous, and since Defendants' web sites do not appear to fall within the definition of "Licensed Product(s) found in Section 1.3(ii)(a), Defendants' motion for summary judgment on the ground that they are protected from suit by the covenant not to sue must be denied.

### C. Implied License By Estoppel / Patent Exhaustion

Defendants move for summary judgment on the alternative ground that the doctrines of license by estoppels and patent exhaustion doom Droplets' case against them.

Defendants acknowledge that the application of these doctrines depends entirely on whether their web sites are "Licensed Products." Since it is not possible to make that determination now, these alternative grounds for summary judgment need not long detain us; Defendants' motion based thereon is also denied.

### CONCLUSION

For the foregoing reasons, Plaintiff's motions to dismiss Defendants' counterclaims (Docket No. 165) and Defendants'

---

motion for summary judgment (Docket No. 172) are denied.

---

causes that section to conflate with Sections 1.3(ii)(a) and (b), which cover situations in which third parties (like Defendants) "use" Adobe Products to "develop or write" their own software or applications, or use the software or applications so created to practice Droplets' patented invention(s). This, Droplets urges, violates the axiom that every clause

of a contract has to be construed in a way that gives it independent meaning. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). Droplets' argument would have considerable force if a web site were either "software" or "applications." But as we have seen, on the record before me, I cannot make that determination.